UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x

UNITED STATES OF AMERICA,

            v.

LESLY VALENTIN, JARRETT BRUCE,
AASIM BOONE, and GREGORY BRUCE,

            Defendants.

-----------------------------------------------------x

**MEMORANDUM AND ORDER**
23-CR-292 (RPK)

RACHEL P. KOVNER, United States District Judge:

Defendants Lesly Valentin, Jarrett Bruce, and Aasim Boone are charged with crimes related to an alleged kidnapping scheme.  Each now moves to suppress various pieces of evidence.  *See* Lesly Valentin Mot. to Suppress (Dkt. #58); Aasim Boone Mot. to Suppress (Dkt. #60); Jarrett Bruce Mot. to Suppress (Dkt. #62-1).  For the reasons set forth below, these motions are denied.

## BACKGROUND

### I. Factual Background

Lesly Valentin, Jarrett Bruce, and Aasim Boone are each charged with participating in a kidnapping conspiracy in December 2022.  In brief, the government alleges that, shortly after 8:00 p.m. on December 9, 2022, two men assaulted a victim outside the victim's apartment complex in Astoria, Queens.  The men forced the victim into a red Chrysler Pacifica, which then fled the scene being driven by a third individual.  Over the next five hours, defendants drove the victim to multiple locations and tortured him, demanding money.  At one point, the assailants removed the victim from the Pacifica and poured bleach on him; while this was happening, the victim noticed a second, occupied car—a gray sedan—parked behind the Pacifica.  After the victim

1

promised to pay his assailants, the men drove him to Manhattan and released him at around 1:00 a.m. on December 10.

Two days later, on December 12, the victim received the first of a series of threatening text messages from a phone number ending in 9980. The texts demanded the promised payment, threatening the victim and his family members if he did not comply. The government alleges that Valentin was the author of these texts, having purchased the phone from which they were sent from a Linkn Wireless store in Asbury Park, New Jersey earlier that same day.

**A.      The Search Warrants**

During its investigation, the government obtained several search warrants for cell-site location information ("CSLI") and iCloud account data for cell phones associated with Valentin, Boone, and Jarrett Bruce. Each of the government's warrant applications was supported by an affidavit from Special Agent Thomas Ford, the principal FBI agent in charge of the investigation into the kidnapping conspiracy.

**1.      The Valentin Warrants**

The government obtained two search warrants for cell phone data related to Valentin: a warrant for CSLI evidence for the phone with a number ending in 0476 (the "0476 Phone") and a warrant for the iCloud account associated with the Apple ID va13ntin@icloud.com and the same 0476 phone number. *See* Valentin Mem. of L. in Supp. of Mot. to Suppress ("Valentin Mot.") 3–7 (Dkt. #58-1); Decl. of Benjamin Yaster, Ex. A (Dkt. #58-3) ("0476 CSLI Warrant"); *Id.*, Ex. B (Dkt. #58-4) ("Valentin iCloud Warrant").

The government's application for the CSLI warrant sought CSLI for that phone from December 8, 2022 through December 13, 2022. *See* 0476 CSLI Warrant, Attach. B. The thrust of Agent Ford's affidavit in support of the warrant is that (1) a different phone (the "9980 Phone")

2

was bought shortly after the kidnapping and then used to transmit threats to the victim; (2) Valentin bought the 9980 Phone; (3) the 0476 Phone was Valentin's personal phone; and (4) CSLI from the 0476 Phone on the dates in question would provide evidence of the kidnapping and extortion plots, by establishing Valentin's whereabouts when the 9980 Phone was acquired and when the broader criminal schemes unfolded. *See* 0476 CSLI Warrant ¶¶ 5–14.

To establish these points, the affidavit recounts the kidnapping and torture of the victim on December 9 and 10, 2022. *Id.* ¶ 5. It then notes that beginning at about 6:48 p.m. on December 12, the victim "received a series of text messages from an unknown individual" using the 9980 Phone, threatening the victim and demanding that he pay the $50,000 promised to his captors. *Id.* ¶ 6.

As relevant to Valentin's suppression motion, the warrant affidavit then offered facts to support the conclusion that Valentin had purchased the 9980 Phone. It states that

> AT&T, the service provider for the 9980 Phone, provided information indicating that the 9980 Phone was purchased at a Linkn Wireless store located at 802 Main Street in Asbury Park, New Jersey at approximately 2:30 p.m. on December 12, 2022. Security camera footage from the store showed a man appearing to purchase a cellular telephone at that time. Security camera footage from outside the store then showed the same man entering and driving away in a Green Ford Explorer bearing New Jersey license plate number H51-RBS.

*Id.* ¶ 7.

The warrant then provides substantial evidence that Valentin frequently used the Green Ford Explorer with that license plate. *Ibid.* And the affiant avers that he "compared pictures of the individual seen purchasing the 9980 Phone in the Linkn Wireless to known pictures of VALENTIN and have confirmed VALENTIN was the person seen in the store." *Ibid.*

3

Next, the warrant affidavit offers evidence, whose sufficiency is not challenged by Valentin, that Valentin was the owner of the 0476 Phone. For instance, the affidavit states that it was the number Valentin provided to his probation officer as his phone number. *Id.* ¶ 9.

Finally, the warrant affidavit asserts that probable cause exists that CSLI for the 0476 Phone "for the period in and around December 8, 2022 through December 13, 2022 constitutes evidence that will assist law enforcement in confirming [Valentin's] location leading up to, during and shortly after both the Victim's kidnapping and the purchase of the 9980 Phone." *Id.* ¶ 10. As relevant to the present motions, in support of that point, the warrant affidavit states that

> subpoena returns confirm that the [0476 Phone] was actively used at and around the time of the kidnapping—including four short outgoing phone calls immediately before the Victim was seen being placed into the Chrysler Pacifica and an incoming call shortly after the Victim reported being released at 1 a.m. on December 10, 2022. In addition, the [0476 Phone] was active at the time at which VALENTIN purchased the 9980 Phone—including two outgoing calls and one incoming call around the time of the purchase.

*Id.* ¶ 9.

The government's search warrant for the va13ntin@icloud.com iCloud account authorized agents to obtain, without temporal limitation, "information regarding the identification of" the account; records of devices associated with the account; e-mails and instant messages associated with the account; all files and records stored on the iCloud for the account; activity and transactional logs for the account; and information regarding locations where the account was accessed. Valentin iCloud Warrant, Attach. B. The warrant then directs agents to seize from those records "information . . . that relates to" kidnapping and interstate threats. *Ibid.* It outlines several types of information within this category, including the identity of the person who created the Apple ID; "[r]ecords of communications relating to kidnapping, threat[s], and extortion," records of searches relating to kidnapping and transmission of threats; and information relating to Valentin's "schedule, travel, and location, as well as that of co-conspirators and victims." *Ibid.*

Agent Ford's affidavit in support of the Valentin iCloud warrant set forth his basis to believe Valentin was involved in kidnapping and interstate transmission of threats with at least two other individuals. It recounts essentially the same narrative as the 0476 CSLI warrant, with one major addition: the revelation that CSLI obtained from the 9980 phone and Valentin's personal phone, the 0476 Phone, indicated that the two phones "were in the same location between the time that the 9980 Phone was purchased and the time it was turned off, and not turned on again, on December 14, 2022." *Id.* ¶ 8.

In support of the contention that Valentin's iCloud account would contain evidence of kidnapping and interstate transmission of threats, the affidavit notes that Apple records revealed that the user of the account "backed up data to the Subject iCloud Account for the following iCloud features: iCloud backup, bookmarks, calendars, iCloud photos, contacts, Find My Friends, iCloud drive, iCloud reminders, mail, mail header, notes, and Apple sign-ins." *Id.* ¶ 13. The affiant notes that Valentin "was using the 0476 Phone in or around the time the" kidnapping and threats offenses "were committed." *Id.* ¶ 14(b). It further states that in the affiant's training and experience, "individuals engaged in kidnapping conspiracies commonly use the internet as part of engaging in such schemes and commonly access the internet and email through cellular phones or similar devices." *Id.* ¶ 14(d). Moreover, it states, "criminals often use cell phones to communicate with others, including victims [and] to store the names and contact information of victims or co-conspirators"; "to search or browse the internet for information relating to their criminal conduct"; and "to take and store photographs of their criminal activities." *Id.* ¶ 14(b).

### 2.    The Boone Warrants

The government obtained several search warrants for cell phone data related to Boone; the bulk of his motion pertains to the warrant for CSLI evidence for the phone with a number ending

in 9299 (the "9299 Phone"). *See* Boone Mem. of L. in Supp. of Mot. to Suppress ("Boone Mot.")
14–20 (Dkt. #60-1); Decl. of Sean Haran, Ex. I (Dkt. #60-11) ("9299 CSLI Warrant"); *see also*
*id.*, Ex. E (Dkt. #60-7); *id.*, Ex. H (Dkt. #60-10); *id.*, Ex. J (Dkt. #60-12) (additional search
warrants).

Agent Ford's affidavit in support of the 9299 CSLI warrant relies on several categories of
evidence. It describes the kidnapping and transmission of threats under investigation. 9299 CSLI
Warrant ¶¶ 5–6. It then sets forth evidence of Valentin's involvement, including his purchase of
the 9980 Phone used to transmit threats. *Id.* ¶ 7. The affidavit next describes how CSLI from
Valentin's 0476 Phone provided evidence of his involvement in the kidnapping, by showing
Valentin "traveling from New Jersey to New York on December 9, 2022—the day of the
kidnapping—and show[ing] that he was in the vicinity of the Victim's apartment in Astoria,
Queens and across the Queensborough Bridge from where the Victim was released at
approximately 12:30 a.m. on December 10, 2022—shortly before the Victim was released." *Id.*
¶ 8.

Tying these events to the 9299 Phone, the affidavit states that the search warrant of
Valentin's iCloud account revealed that approximately a half hour before the victim was kidnapped
on December 9, Valentin sent text messages to the 9299 number—of which Boone is the
subscriber—stating, "Yo hit me. I'm behind." *Id.* ¶ 10. The affidavit states that based on Ford's
"training and experience and involvement in this investigation," Ford believed that Valentin was
telling Boone shortly before the kidnapping "that he was either (1) physically behind him or
(2) that he was running late at that point and wanted to speak to him further in connection with the
then-planned kidnapping of the Victim." *Ibid.*

The affidavit submitted that given Valentin's "indication that he was in close proximity to—or was attempting to get within close proximity of"—the owner of the 9299 Phone and its owner around the time of the kidnapping, location information from the 9299 Phone would likely confirm Valentin's location around the time of the kidnapping. *Id.* ¶ 11. Further, the affidavit states, "the information sought will likely provide information about additional subjects in the kidnapping, including Boone." *Ibid.* As evidence that the kidnapping involved multiple conspirators, the affidavit emphasizes that the victim reported that a second car appeared to be closely following the vehicle in which he was abducted. *Ibid.*

### 3.    The Jarrett Bruce Warrants

The government obtained two search warrants for cell phone data related to Jarrett Bruce: a warrant for CSLI evidence for the phone with a number ending in 9462 (the "9462 Phone") and a warrant for the iCloud account associated with the Apple ID jarretbruce8183@gmail.com and the same 9462 phone number. *See* Jarrett Bruce Mem. of L. in Supp. of Mot. to Suppress 2–5 (Dkt. #62) ("Jarrett Bruce Mot."); *id.*, Ex. A (Dkt. #62-2) ("9462 CSLI Warrant"); *id.*, Ex. C (Dkt. #62-4) ("Jarrett Bruce iCloud Warrant").

Like the affidavits discussed previously, Agent Ford's affidavits in support of those warrants describe CSLI evidence suggesting that Boone and Valentin were involved in the kidnapping. 9462 CSLI Warrant ¶¶ 5–14; Jarrett Bruce iCloud Warrant ¶¶ 5–14. In addition, those affidavits state that the government obtained texts and records from a consensual search of the victim's phone showing that Jarrett Bruce and the victim frequently corresponded about dealing marijuana and cocaine. 9462 CSLI Warrant ¶¶ 16–17; Jarrett Bruce iCloud Warrant ¶¶ 17, 19. In the October preceding the kidnapping, Jarrett Bruce and the victim had a dispute over money that Bruce believed the victim owed him, in connection with marijuana. *Ibid.* Over the

next two months, Bruce and the victim spoke by phone over twenty times.  9462 CSLI Warrant ¶ 18; Jarrett Bruce iCloud Warrant ¶ 19.  On the night of the kidnapping itself, December 9, phone records show multiple calls both between Valentin and Jarrett Bruce and between Boone and Jarrett Bruce, both during and immediately after the events of the kidnapping.  9462 CSLI Warrant ¶ 19; Jarrett Bruce iCloud Warrant ¶ 21.  And finally, on December 12, Valentin called Bruce on the 9462 Phone twenty-three minutes before the 9980 Phone sent the first of several threatening texts to the victim.  9462 CSLI Warrant ¶ 20; Jarrett Bruce iCloud Warrant ¶ 21.

As with the search warrant for Valentin's iCloud account, the warrant for Jarrett Bruce's iCloud account did not include a temporal restriction.  *See* Jarrett Bruce iCloud Warrant, Attach. B.

### B.    Boone's Arrest and Interview

Boone was arrested by Agent Ford and NYPD Detective Cris Schiavone on January 31, 2024, at approximately 4:00 p.m., in New Jersey.  *See* Gov't Mem. of L. in Opp'n to Defs.' Mots. ("Gov't Opp'n") 21 & n.5 (Dkt. #67).  They drove him to the FBI's headquarters in New York. Boone asserts that the two officers "spoke to [him] about the severity of the kidnapping charges and the jail time he could face" during the drive.  *See* Boone Mot. 8.  Timestamped footage indicates that he was interviewed beginning at approximately 5:35 p.m.  *See* Decl. of Sean Haran, Ex. F 23:10 (Dkt. #60-8).  The total interview lasted less than an hour and a half.  *See ibid.*  At the outset of the interview, before reading Boone his *Miranda* rights, Agent Ford and Detective Schiavone briefly explained to Boone the seriousness of the federal kidnapping charges he faced, asserted that a co-defendant had given the officers Boone's name, described their case as a "slam dunk," and encouraged Boone to "save himself" by cooperating to obtain a lighter sentence.  *See*

*id.* at 24:00–26:30.  They then read Boone his *Miranda* rights, which he indicated, verbally and in writing, that he understood.  *See id.* at 27:00–27:45.

The tone of the interview was cordial, and Boone freely engaged with the two officers in conversation.  The officers never raised their voices at or threatened Boone.  For his part, Boone did not appear stressed or confused.  He repeatedly expressed that he was "not worried about nothing" and denied his presence at the kidnapping, including by repeatedly stating that the officers' CSLI evidence could not implicate him because he would have known not to carry his own cell phone during the commission of a crime.  *See, e.g.*, *id.* at 40:46, 44:00, 45:20, 50:35, 50:43, 55:19.

Boone was brought before a magistrate judge to be arraigned at approximately 4 p.m. the day after his arrest in the Eastern District of New York.  *See* Min. Entry for Arraignment Proceeding (Dkt. #32).

### C.    The Witness Identifications of Valentin

In the course of its investigation, the FBI interviewed two witnesses who made positive, out-of-court identifications of Valentin.

First, on February 8, 2023, two FBI agents interviewed the owner of an autobody repair shop at his facility in Asbury Park, New Jersey.  *See* Decl. of Benjamin Yaster, Ex. I (Dkt. #58-18).  The repair shop was the registered location for the green Ford Explorer in which Valentin had been observed driving to and from the Linkn Wireless store.  Valentin Mot. 31; Gov't Opp'n 61–62.  The agents showed the repair shop owner an arrest photo of Valentin; in response, the owner identified Valentin as a friend of one of the shop's employees.  Decl. of Benjamin Yaster, Ex. I.  The owner stated that he had seen Valentin driving the green Ford Explorer "all around town for months now" and that Valentin showed up at the shop "all the time" in the company of

his employee. *Ibid.* He stated that he knew Valentin had recently been released from prison. *Ibid.* And finally, he identified another car that he had seen Valentin in by color, make, model, and license plate number. *Ibid.*

Second, also on February 8, two FBI agents interviewed an employee of Linkn Wireless, where the 9980 phone was purchased about two months earlier on December 12, 2022. *See* Decl. of Benjamin Yaster, Ex. K (Dkt. #58-20). Valentin and the government disagree about how to interpret the FBI's notes documenting what occurred during this interview. Valentin asserts that the agents first showed the employee a still image from a surveillance video taken outside the Linkn Wireless store showing the man who purchased the 9980 Phone on December 12. *See* Valentin Mot. 32; Valentin Reply in Supp. of Mot. to Suppress 18 (Dkt. #84). Then, the officers showed the employee a six-photo line-up. *See ibid.* Upon seeing the fifth photo, which depicted Valentin, the employee stated that "she had seen that man in the store on numerous occasions." Decl. of Benjamin Yaster, Ex. K. She stated that he could have been the man who purchased the 9980 Phone from the store on December 12, but that she needed to see the surveillance photo again to be sure. *Ibid.* The agents then showed her the surveillance photo again, after which the employee confirmed that the man in the fifth photo from the line-up was the man who had purchased the 9980 Phone. *Ibid.* She explained that he had purchased multiple prepaid flip phones from the store while she was working there before, always paying in cash. *Ibid.* By contrast, the government asserts that the officers first showed the employee the six-photo line-up, and only showed the surveillance photo to the employee when the employee asked to see it, after viewing the line-up. *See* Gov't Opp'n 64.

## II.    Procedural History

### A.    The Indictment

In the operative indictment, Valentin, Boone, and Jarrett Bruce are charged with conspiring to commit kidnapping on December 9 and 10, 2022.  *See* Fourth Superseding Indictment ¶¶ 1–2 (Dkt. #126).  Valentin is charged with transmitting interstate communications with intent to extort, related to his sending the texts from the 9980 phone to the victim.  *Id.* ¶ 3.  Finally, Jarrett Bruce and a fourth co-defendant Gregory Bruce are charged with witness tampering, and Boone is charged with attempted obstruction of justice, related to actions they later are alleged to have taken to destroy evidence in the case against them.  *Id.* ¶¶ 4–5.

### B.    The Suppression Motions

Valentin, Boone, and Jarrett Bruce now each move to suppress various pieces of evidence. All three defendants seek to suppress evidence obtained pursuant to the search warrants for cell phone CSLI evidence and iCloud data.  Each defendant challenges the accuracy of the FBI agent's affidavits used to obtain the warrants, as well as whether those affidavits supplied probable cause. Valentin and Jarrett Bruce also argue that the warrants to search their respective iCloud backups were overbroad for failing to limit the government's search to a narrow time period surrounding the kidnapping.

Valentin and Boone additionally move to suppress statements they made to FBI investigators in post-arrest interrogations.  Valentin moves to suppress particular statements he made prior to being *Mirandized*, while Boone moves to exclude his entire post-arrest, recorded interview on the grounds that his *Miranda* waiver was coerced and that the government violated his right to a speedy presentment.  With the Court's permission, Boone also filed a supplement to

his motion to suppress, which largely repeats the bases for suppression set forth in Boone's original motion.  *See* Boone *Pro Se* Suppl. Mot. (Dkt. #149),

Finally, Valentin moves to suppress the out-of-court identifications made by witnesses interviewed by the FBI as the product of unduly suggestive procedures and unreliable.

### C.    The *Franks* Hearing

The Court granted Valentin's and Boone's requests for a *Franks* hearing.  *See* Nov. 14, 2024 Order.  Specifically, the Court granted Valentin's and Boone's requests for a hearing on Agent Ford's statements (1) in the warrant for Valentin's CSLI that his phone "was actively used at and around the time of the kidnapping—including four short outgoing phone calls immediately before the Victim was seen being placed into the Chrysler Pacifica and an incoming call shortly after the Victim reported being released at 1 a.m."; (2) in the warrant for Boone's CSLI that his phone received two text messages from Valentin reading "Yo hit me.  I'm behind" "at approximately 7:24 p.m. on December 9, 2022—approximately half an hour before the Victim's kidnapping"; and (3) in the warrants for Valentin's CSLI and iCloud backup that security camera footage from inside the Linkn Wireless store during the time the 9299 Phone was purchased "showed a man appearing to purchase a cellular telephone at that time."  *See* Jan. 22, 2025 Order; *Franks* Hr'g Tr. 3:22–4:10 (Dkts. #150, 158).  Over the course of two days, Agent Ford testified regarding the circumstances of these representations.  *See* Jan. 28, 2025 Min. Entry & Order; Feb. 3, 2025 Min. Entry & Order.

## DISCUSSION

The motions to suppress are denied.

I.    **Valentin's, Boone's, and Jarrett Bruce's Motions to Suppress Cell Site Location Information and iCloud Accounts**

Valentin's, Boone's, and Jarrett Bruce's motions to suppress CSLI and iCloud accounts associated with their respective cell phones are denied.

A.    **Legal Standard**

1.    **Probable Cause**

Under the Fourth Amendment, law enforcement must generally obtain a warrant supported by probable cause in order to obtain CSLI. *Carpenter v. United States*, 585 U.S. 296, 309–10, 316–17 (2018). The same is true of obtaining data from an iCloud account. *See United States v. Ortega*, No. 22-CR-91 (RA), 2022 WL 16647779, at *1 (S.D.N.Y. Nov. 2, 2022) (collecting cases).

Probable cause exists "where a totality of circumstances indicates a 'fair probability that contraband or evidence of a crime will be found'" in a particular place. *United States v. Lauria*, 70 F.4th 106, 128 (2d Cir. 2023) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The warrant must "establish[] a sufficient nexus between the criminal activities alleged" and the place or object to be searched. *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004). The probable cause "standard does not demand 'hard certainties,' but it does require more than a 'hunch.'" *Lauria*, 70 F.4th at 128 (citations omitted). The inquiry is a "commonsense, practical" one judged by "the factual and practical considerations of everyday life," not legal technicalities. *Gates*, 462 U.S. at 230–31. When a magistrate judge has issued a warrant based on probable cause, "a court reviewing a challenged warrant—whether at the district or appellate level—'must accord considerable deference to the probable cause determination of the issuing magistrate.'" *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011). Because of "the Fourth Amendment's strong preference for searches conducted pursuant to a warrant," *Gates*, 462 U.S. at 236 (citation omitted), "the task of

13

a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the magistrate 'a substantial basis' for making the requisite probable cause determination," *Clark*, 638 F.3d at 93.

### 2.    Good-Faith Exception

Even when a warrant is deemed invalid, suppression is not automatic. "A violation of the Fourth Amendment does not necessarily result in the application of the exclusionary rule." *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010). The exclusionary rule is a "judicially created rule . . . designed to safeguard Fourth Amendment rights generally through its deterrent effect." *Herring v. United States*, 555 U.S. 135, 139–40 (2009) (citation and quotation marks omitted). The benefits of suppression for "deterring Fourth Amendment violations in the future" must outweigh the costs—principally, the risk of "letting guilty and possibly dangerous defendants go free." *Id.* at 141. Accordingly, "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant" will not be suppressed. *United States v. Leon*, 468 U.S. 897, 922 (1984).

The government bears the burden of establishing the objective reasonableness of an officer's good faith reliance on a subsequently invalidated warrant. This burden is not high— "most searches conducted pursuant to a warrant . . . likely fall within" the good faith exception to the exclusionary rule. *Clark*, 638 F.3d at 100. The Supreme Court has identified four circumstances that do not fall within the good-faith exception: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)).

14

"The standard of reasonableness in the context of suppression mirrors that in the context of qualified immunity." *United States v. Nejad*, 436 F. Supp. 3d 707, 732 (S.D.N.Y. 2020) (citing *Messerschmidt v. Millender*, 565 U.S. 535, 546 n.1 (2012)). "Thus, where denial of qualified immunity would be appropriate in the civil context because clearly established law establishes a warrant's invalidity, so too must a court conclude that an officer's conduct was objectively unreasonable for purposes of the good faith inquiry." *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 472 (S.D.N.Y. 2013). And conversely, reliance on a warrant cannot be objectively unreasonable for purposes of the good-faith exception in the absence of "clearly established law establishing [its] invalidity." *Nejad*, 436 F. Supp. 3d at 732.

### 3.    Inaccuracies in Search Warrant Affidavits

*Franks v. Delaware*, 438 U.S. 154, 171 (1978), established the framework for claims that evidence obtained pursuant to a search warrant should be suppressed because the warrant affidavit contained misrepresentations. To overcome the "presumption of validity" that applies to "the affidavit supporting the search warrant," *Lauria*, 70 F.4th at 124 (quoting *Franks*, 438 U.S. at 171), the defendant "must satisfy both a state of mind requirement and a materiality requirement" with respect to any inaccuracies. *Id.* at 125. He must show "that '(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the issuing judge's probable cause finding.'" *Id.* at 125 (quoting *United States v. Canfield*, 212 F.3d 713, 717–18 (2d Cir. 2000)). If the alleged misstatement is material, and if the defendant makes "a substantial preliminary showing that" it "was included by the affiant in the warrant affidavit" "knowingly and intentionally, or with reckless disregard for the truth," then the court must hold a *Franks* hearing,

where the defendant bears the burden of establishing perjury or reckless disregard for the truth by a preponderance of the evidence. *Id.* at 124 (quoting *Franks*, 438 U.S. at 155–56).

"Whether [the affiant] acted deliberately or recklessly is a factual question of intent." *United States v. Trzaska*, 111 F.3d 1019, 1028 (2d Cir. 1997). "The meaning of an intentional falsehood is self evident." *United States v. Kunen*, 323 F. Supp. 2d 390, 395 (E.D.N.Y. 2004). With respect to recklessness, the test is subjective. *United States v. Rajaratnam*, 719 F.3d 139, 153 (2d Cir. 2013). This inquiry examines "not what a reasonably prudent person would have appreciated given the attendant circumstances but rather whether the defendant in fact entertained serious doubts as to the truth of the subject statements." *United States v. Kunen*, 323 F. Supp. 2d 390, 395 (E.D.N.Y. 2004) (quotation marks and citation omitted) (collecting cases). "Whether an individual had a particular mental state is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Rajaratnam*, 719 F.3d at 153 (quotation marks and citation omitted). However, "courts must not confuse a mental state with the proof of its existence." *Ibid.* (brackets, quotation marks, and citation omitted). The defendant must offer "credible and probative evidence" that the misrepresentation or omission "was designed to mislead or was made in reckless disregard of whether it would mislead." *Id.* at 154 (brackets, quotation marks, and citation omitted).

To determine if misrepresentations or omissions are material, "courts 'correct' the warrant affidavit and determine whether the affidavit, so corrected, establishes probable cause." *Lauria*, 70 F.4th at 125. If so, the misrepresentation or omission is "immaterial, and suppression is unnecessary." *Ibid.*

B.    **Analysis**

1.    **Valentin's Motion to Suppress the 0476 CSLI**

Valentin moves to suppress the CSLI evidence relating to the 0476 Phone.  *See* Valentin Mot. 2–21.  First, Valentin argues that the affidavit supporting the CSLI warrant contained knowing or reckless, material misstatements.  Second, Valentin argues that the warrant application failed to establish a sufficient nexus between the kidnapping and threats offenses and the 0476 CSLI, such that probable cause existed that evidence of the former would be found in the latter.  Valentin's motion is denied.

Valentin first argues that the affidavit supporting the CSLI warrant contained knowing or reckless material misstatements.  He identifies four purported misstatements in Agent Ford's affidavit supporting the CSLI warrant for the 0476 Phone: (1) that AT&T "provided information indicating that the 9980 phone was purchased at a Linkn Wireless store located . . . in Asbury Park, New Jersey at approximately 2:30 pm on December 12, 2022"; (2) that surveillance footage from the Linkn Wireless store "showed a man appearing to purchase a cellular telephone at that time"; (3) that the 0476 Phone "was actively used at and around the time of the kidnapping"; and (4) that the 0476 Phone was in use "around the time of the purchase" of the 9980 Phone.  0476 CSLI Warrant ¶¶ 7, 9; *see* Valentin Mot. 11–19.

The first statement—that AT&T's data indicated the date, time, and location the 9980 Phone was purchased—was accurate.  The information obtained by the FBI from AT&T prior to applying for the 0476 CSLI warrant showed that the 9980 Phone was a prepaid device, its address was listed as the Asbury Park Linkn Wireless store, it first connected to AT&T's service at 2:23 p.m. on December 12, and it was activated later the same day at 3:13 p.m. from within Asbury Park, though some distance away from the Linkn Wireless store.  Valentin Mot. 11–12; Gov't

Opp'n 33–34; *see* Decl. of Benjamin Yaster, Ex. C (Dkts. #58-5 to -8). This information collectively does "indicat[e]" that the prepaid phone was purchased at the Linkn Wireless store around the indicated time.

Valentin has also failed to demonstrate that Agent Ford made a statement that was perjurious or reflected disregard for the truth when he described surveillance footage as showing a man appearing to purchase a cell phone from a Linkn Wireless store around 2:30 p.m. on December 12, 2022. Valentin relies on the fact that surveillance footage law enforcement agents ultimately obtained from the store does not capture the moment when a transaction occurred. At the *Franks* hearing, however, Ford explained that the statements regarding the purchase were supported by information from another source. Specifically, an NYPD officer named David Bonacarti reviewed surveillance footage from the store's CCTV system while in the store, and relayed to Ford over the phone that, on the video he viewed, Bonacarti "witnessed Mr. Valentin come in and purchase the cell phone." *Franks* Hr'g Tr. 28–30. Bonacarti also memorialized this observation in an FBI report. *Id.* at 29; Gov't Opp'n, Ex. A. Agent Ford—who stated in the warrant affidavit that the facts described in his affidavit came, in part, from "information obtained from other agents," 0476 CSLI Warrant ¶ 3—testified that he relied on Officer Bonacarti's statements in stating that video footage showed the purchase of a cell phone, *Franks* Hr'g Tr. 32. Ford testified that he did not realize that the video clips that the store owner then downloaded for the investigators from this raw footage—the ones contained in law enforcement files—were incomplete until months after the search warrant had been obtained. *Franks* Hr'g Tr. 143–44, 153–54.

Valentin has failed to show that the statements regarding what the surveillance footage showed were inaccurate, much less reflective of deliberate or reckless falsehood. Valentin has

failed to show that the statements in the affidavit do not reflect events that Officer Bonacarti observed on in-store video—but that simply were not captured on the video agents downloaded. As to *mens rea*, even if it were posited that Officer Bonacarti actually misrepresented the contents of the video he reviewed in the store, Valentin has failed to show that Ford acted with reckless disregard for the truth or deliberately lied when he incorporated Officer Bonacarti's statements into his search warrant affidavit. "The law is clear that law enforcement officers may reasonably rely on information provided to them by other law enforcement officers" in applying for a search warrant. *Bowen v. County of Westchester*, 706 F. Supp. 2d 475, 487 (S.D.N.Y. 2010); *see id.* at 479–81, 485–87 (finding no *Franks* violation where the affiant officer disclosed that he was relying on information from other officers and where there was no evidence that the affiant officer doubted the veracity of the information provided by those other officers); *see also United States v. Ventresca*, 380 U.S. 102, 111 (1965) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number."). While a more diligent review would have revealed that the surveillance footage actually downloaded from Linkn Wireless's system did not depict the moment of purchase that Officer Bonacarti had described, the failure to recognize this discrepancy amounts to, at most, negligence on the part of Ford.

As for Agent Ford's statement that the 0476 Phone was "actively used at and around the time of the kidnapping," Valentin has not shown that these statements, though misrepresentations, were deliberately or recklessly made. Ford's affidavit identified five phone calls on December 9 and 10: four short outgoing calls immediately before the kidnapping, and one incoming call shortly after the victim was released. 0476 CSLI Warrant ¶ 9. These statements appear to reflect a misreading of call records. A spreadsheet of call detail records that T-Mobile provided the

government lists four calls at about 1 a.m. on December 10 in Coordinated Universal Time (UTC), which corresponds to about 8 p.m. on December 9 in Eastern Standard Time. *See* Decl. of Benjamin Yaster, Ex. F1 at 2 (Dkt. #58-11). Each of these calls is labeled "Outgoing" in the "Direction" field and "Completed Successfully" in the "Completion Code" field. *Ibid.* However, neither number listed in the "Calling Number" and "Called Number" fields matches the 0476 Phone. *Ibid.* These calls are also each labeled with "02B" in the "Service Code" field. *Ibid.* An accompanying 33-page guidebook for interpreting the call records provided by T-Mobile states that code "02B" corresponds to "Call Forwarding on Not Reachable"; in other words, these four calls appear to have actually been incoming calls to the 0476 Phone that were not completed and instead were forwarded to voicemail. *See* Decl. of Benjamin Yaster, Ex. F3 at 9 (Dkt. #58-13); *Franks* Hr'g Tr. 24–25, 68–72. Agent Ford testified at the *Franks* hearing that he did not read the T-Mobile guidebook while interpreting the records, instead relying on his own experience. *Franks* Hr'g Tr. 22, 69.

As for the fifth call, although Ford's affidavit reported that the call occurred "shortly after the Victim reported being released at 1 a.m. on December 10, 2022," T-Mobile's subpoena returns list the call as occurring at 5:27 a.m. UTC. Decl. of Benjamin Yaster, Ex. F1 at 2. Converted to Eastern Standard Time, this call occurred at 12:27 a.m., which would have been during the kidnapping, not after. Ford testified that this was the result of an "arithmetic error" resulting from him confusing the conversion of UTC to Eastern Standard Time (a five-hour difference) with the conversion of UTC to Eastern Daylight Time (a four-hour difference). *Franks* Hr'g Tr. 27, 79, 87–88.

On the whole, the record establishes these errors are "more consistent with carelessness and negligence than with knowing or deliberate falsehoods [or] reckless disregard." *United States*

*v. Lambus*, 897 F.3d 368, 401 (2d Cir. 2018).  With respect to the four calls sent to voicemail, the T-Mobile spreadsheet reviewed by Agent Ford specifically labels each call as "Outgoing" and "Completed Successfully."  Ford credibly testified that he took these descriptions at face value and did not suspect that the unadorned code "02B" warranted further investigation.  *Franks* Hr'g Tr. 22.  Likewise, Ford's explanation that he simply confused the time zone adjustment for the fifth call was not rebutted by Valentin.  There is little reason to suspect the one-hour difference would have been intentionally or subjectively recklessly introduced when the error tended, if anything, to lessen the case for probable cause—a call during the ongoing kidnapping would have bolstered the case for the 0476 Phone's CSLI containing evidence relevant to the kidnapping more than a call occurring just after.  *See Lauria*, 70 F.4th at 131 (noting that if an "an accurate presentation of [the] facts" would have "strengthened, not weakened, the application's proffer as to probable cause," any errors are more likely to be the product of negligence, rather than intentional falsity or reckless disregard for the truth) (citation omitted).

Valentin's final purported misrepresentation, Agent Ford's statement that the 0476 Phone "was active at the time at which Valentin purchased the 9980 Phone—including two outgoing calls and one incoming call around the time of the purchase," was true.  The 9980 Phone was purchased from the Linkn Wireless store at approximately 2:30 p.m.  T-Mobile's subpoena returns show two outgoing calls from the 0476 Phone at 1:06 p.m. and 1:12 p.m. and an incoming call at 5:46 p.m.  These calls are fairly described as occurring "around the time of the purchase," when keeping in mind the affidavit's purpose to establish probable cause that the 0476 Phone's CSLI would constitute evidence aiding "law enforcement in confirming [Valentin's] location leading up to, during and shortly after the . . .  purchase of the 9980 Phone."  0476 CSLI Warrant ¶ 10.  These

calls are evidence that the phone was used "leading up to" and "shortly after" the 9980 Phone's purchase. It was not false or misleading to describe them the way Ford's affidavit did.

Finally, Valentin argues that, even accepting the 0476 CSLI warrant application as-is, Ford failed to establish probable cause to believe the phone's CSLI would yield evidence of the kidnapping or threats offenses. Valentin is incorrect. The affidavit documents evidence that the 0476 Phone was Valentin's principal phone. 0476 CSLI Warrant ¶ 9. As described above, Ford's affidavit stated (rightly or wrongly) that the 0476 Phone was in active use immediately before and after both the kidnapping and the purchase of the 9980 Phone from which the threats were made. The warrant sought CSLI for a period of six days surrounding the kidnapping and sending of the threats. If Valentin, the owner of the 0476 Phone, was in possession of the phone during those periods, it stands to reason that there is a "fair probability" that the phone's CSLI would be geolocation evidence relevant to the kidnapping and threats scheme. *See United States v. Rutledge*, No. 23-CR-269 (FB), 2024 WL 1834801, at *3 (E.D.N.Y. Apr. 26, 2024) ("To justify the [CSLI] Warrant, the Government can show probable cause that Rutledge . . . was carrying his cell phone at the time of the robbery . . . ."); *United States v. Baines*, No. 02-CR-261 (MPS), 2022 WL 35807, at *2 (D. Conn. Jan. 4, 2022) (finding probable cause supported a search warrant for CSLI where, *inter alia*, affidavit stated that "members of this conspiracy 'used cell phones to communicate with each other during burglaries'"). These case-specific details render this case unlike *United States v. Bertini*, where the affidavit failed to establish that the defendant "was carrying a cell phone when he committed the bank burglaries" or that he "had used his cell phone to facilitate the burglaries," instead merely relying on the generalization that "most people carry cell phones most of the time." No. 23-CR-61 (PGG), 2023 WL 8258334, at *7, 9 (S.D.N.Y. Nov. 29, 2023).

Valentin's motion to suppress the 0476 CSLI is denied.

### 2.    Valentin's Motion to Suppress Evidence from His iCloud Account

Next, Valentin moves to suppress the results of a search of his iCloud account, va13ntin@icloud.com, which was linked to the 0476 Phone. *See* Valentin Mot. 22–30. Valentin raises four grounds for suppression of the fruits of this warrant: (1) that because the iCloud search warrant affidavit describes evidence obtained from the 0476 CSLI warrant, the iCloud search warrant depends on fruits of an unlawful search; (2) that Agent Ford's affidavit supporting the iCloud search warrant application contained material misstatements; (3) that the warrant application failed to establish a sufficient nexus between the kidnapping and threats offenses and the iCloud backup; and (4) that the search warrant was overbroad for failing to include a temporal restriction. Valentin's motion is denied.

Because Valentin is not entitled to suppression of the 0476 Phone CSLI, *see* pages 17–22, *supra*, Valentin's argument that the warrant for the iCloud backup was tainted by evidence obtained from an unlawful search of the 0476 Phone CSLI fails.

Valentin's argument that the warrant rested on material misrepresentations also lacks merit. Valentin first invokes the same misstatements that he argues tainted the 0476 CSLI affidavit. But for the same reasons those misstatements do not warrant suppression of the fruits of the 0476 CSLI warrant, they do not warrant suppression of the fruits of the iCloud warrant.

Valentin identifies an additional purported misrepresentation in the iCloud account affidavit: Agent Ford's statement that the 0476 and 9980 Phones' CSLI "confirmed that the 9980 Phone and the 0476 Phone were in the same location between the time that the 9980 Phone was purchased and the time it was turned off." Valentin iCloud Warrant ¶ 8. Valentin argues that this statement "cannot be reconciled" with Ford's statement in the affidavit supporting the 0476 CSLI warrant, Valentin Mot. 24, that the 9980 Phone's CSLI "did not provide data sufficient to allow

law enforcement to learn the 9980 Phone's location in the days after it was purchased and activated," 0476 CSLI Warrant ¶ 8 n.2.  He therefore argues that one or the other statement must be the product of a deliberate or reckless misrepresentation or omission.  Valentin Mot. 24.

But Ford's affidavits do not conflict.  Agent Ford's 0476 CSLI affidavit made clear that CSLI records provide "an approximate location of [a] cellular telephone" but that this data is "typically less precise than other types of location information."   0476 CSLI Warrant ¶ 11. Consistent with this principle, the affidavit stated that "AT&T provided information indicating that 9980 Phone was in the general vicinity of Asbury Park—the area in which VALENTIN purchased the phone and lives—but did not provide data sufficient to allow law enforcement to learn the 9980 Phone's location in the days after it was purchased and activated."  *Id.* ¶ 8 n.2. These statements do not conflict with the iCloud account affidavit's statement that the CSLI from both phones indicated they were in the same locations between December 12 and 14.  If two phones consistently ping the same cell towers over the course of several days, appearing to travel together, an officer can reasonably infer that they were "in the same location[s]," even if CSLI's limitations prevent the officer from determining exactly where either phone was at a given moment.  Valentin has thus not made a substantial preliminary showing that the iCloud warrant affidavit's representation regarding the co-location of the two phones was a material misrepresentation.  For essentially this reason, even if Agent Ford's prior caveats about the limitations of CSLI data in the 0476 CSLI affidavit were included in the iCloud account affidavit, there would have been probable cause to search the iCloud account, meaning any omissions to that end were not material.

In any event, Agent Ford's allegation regarding co-location of the 0476 and 9980 Phones was not necessary to probable cause.  The warrant affidavit included other allegations to establish that Valentin was tied to the 9980 Phone used to transmit threats to the victim—most notably

evidence indicating that he purchased the 9980 Phone shortly before the phone was used to transmit the threats. The warrant affidavit also included other allegations to establish that the 0476 Phone was in active use around the times of the kidnapping and threats at issue in this case. Agent Ford's statement regarding co-location of the 9980 and 0476 Phones—while bolstering the evidence on these two points—was not necessary to either of them, and was therefore not necessary to the magistrate judge's probable cause determination.

Next, Valentin argues that the warrant affidavit failed to establish a sufficient nexus between the kidnapping and threats offenses and the iCloud account. The affidavit set forth Agent Ford's basis to believe Valentin was involved in the kidnapping and threats offenses. Valentin iCloud Warrant ¶¶ 5–8. As in his affidavit supporting the 0476 CSLI warrant, Ford averred in the affidavit supporting the Valentin iCloud backup warrant that the 0476 Phone was actively in use at and around at the time of both the kidnapping and the threats. *Id.* ¶ 9; *see* Valentin Mot. 25 ("SA Ford's affidavit proffered facts that, if accepted, would establish that the 0476 phone . . . was actively used during the course of the kidnapping and threats."). He then identified several specific types of data that Apple had indicated Valentin's iCloud account was backing up, including photos, contacts, and emails. Valentin iCloud Warrant ¶ 13. And he provided generalizations, based in his professional experience, about how criminals often use their phones and the types of evidence that may often be recovered from iCloud accounts. *Id.* ¶ 14.

Courts have found probable cause to search a cell phone where there is evidence that a criminal suspect was using the phone around the time of or during the investigated crime, on the grounds that the phone is then likely to contain evidence related to that crime. *See United States v. Samuels*, No. 24-CR-305 (ALC), 2025 WL 723209, at *7–8 (S.D.N.Y. Mar. 6, 2025); *United States v. King*, No. 21-CR-255 (NSR), 2022 WL 875383, at *3–4 (S.D.N.Y. Mar. 24, 2022);

*United States v. Harvey*, No. 21-CR-335 (SJ), 2022 WL 684050, at *8–9 (E.D.N.Y. Mar. 8, 2022); *see also Lauria*, 70 F.4th at 130 n.14 ("[P]robable cause as to a person's criminal conduct can sometimes inform probable cause . . . to obtain records for electronic devices linked to that person."). Here, the evidence of Valentin's use of the 0476 Phone during the specific crimes being investigated, as well as the evidence that much of the data on the phone was being backed up to the iCloud account, establishes probable cause for the iCloud warrant. And even if the magistrate judge erred and the affidavit fell short, the good-faith exception would apply, as the warrant was neither so lacking in indicia of probable cause nor so facially deficient that reliance upon it was objectively unreasonable.

Finally, the good-faith exception to the exclusionary rule forecloses Valentin's argument that the evidence from his iCloud account should be suppressed because the search warrant for that account failed to include a temporal restriction. Digital accounts such as iCloud accounts can store a broad swath of personal data covering many years. Accordingly, the absence of temporal limitations in a warrant for such data raises the specter of overbreadth. *See, e.g.*, United *States v. Zelaya-Veliz*, 94 F.4th 321, 339–40 (4th Cir. 2024); *United States v. McCall*, 84 F.4th 1317, 1328 (11th Cir. 2023). Nevertheless, neither the Supreme Court nor the Second Circuit has categorically required temporal limits for such accounts. *See United States v. Purcell*, 967 F.3d 159, 180–81 (2d Cir. 2020) (warrant for "twenty-four categories of evidence that together amounted to virtually all data associated with a Facebook account" was not overbroad); *United States v. Shipp*, 392 F. Supp. 3d 300, 310–11 (E.D.N.Y. 2019), (describing "a temporal limitation for the data being searched" as "not 'an absolute necessity,'" but as "mitigat[ing] concerns about the breadth of a warrant," and compiling cases authorizing warrants without durational limitation (quoting *United States v. Hernandez*, No. 09-CR-625 (HB), 2010 WL 26544, at *11 (S.D.N.Y. Jan. 6, 2010)), *aff'd,*

No. 21-1284-CR, 2022 WL 16543193 (2d Cir. Oct. 31, 2022). In other words, "there is no clearly established law in this Circuit with respect to when and to what degree time limitations are required." *United States v. Disla Ramos*, No. 22-CR-431 (LJL), 2022 WL 17830637, at *11 (S.D.N.Y. Dec. 21, 2022) (discussing CSLI warrant).

In the absence of categorical rules, whether a time limit is required depends on a warrant-by-warrant inquiry into all the factors bearing on probable cause, such as the nature of the offense under investigation, the nature of the material sought, and the duration of the warrant. The "complexity and duration of the alleged criminal activities" is one relevant factor. *Hernandez*, 2010 WL 26544, at *11; *compare United States v. Harvey*, No. 21-CR-335 (SJ), 2022 WL 684050, at *10 (E.D.N.Y. Mar. 8, 2022) (finding a search warrant for a Facebook account that lacked a temporal restriction overbroad where the subject crimes were "relatively unsophisticated" and took place over three weeks"), *and United States v. Garcia*, No. 20-CR-58 (KAD), 2023 WL 4850553, at *11 (D. Conn. July 28, 2023) (finding a search warrant for "any electronic devices" possessed by the defendant "without any temporal or subject matter limitations" overbroad because it reached far beyond communications sent "in reasonable temporal proximity to the homicide"), *with United States v. Ying Lin*, No. 15-CR-601 (DLI), 2018 WL 3416524, at *7 (E.D.N.Y. July 11, 2018) (upholding an unrestricted search warrant against an overbreadth challenge where affidavit alleged a multi-year conspiracy). Here, because the iCloud account had been in use since May 2021 and the warrant was executed in May 2023, the warrant effectively covered about two years, even though the crime described in the warrant affidavit took place over four days in December 2022. Nevertheless, the crimes alleged involved an interstate kidnapping and extortion scheme involving multiple co-conspirators that must have involved some degree of coordination and planning—the

government was surely justified in requesting a search encompassing more than just the four days in December over which the kidnapping scheme was carried out.

While the yearslong scope of the warrant raises concerns on these facts, without more developed precedent regarding the durational scope of such warrants, it is not possible to conclude that "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization" of the search. *Zelaya-Veliz*, 94 F.4th at 341 (quoting *Leon*, 468 U.S. at 922 n.23). Accordingly, at minimum, the government is entitled to use the fruits of the warrant under the good-faith exception to the exclusionary rule. *See, e.g.*, *id.* at 340–41; *McCall*, 84 F.4th at 1328; *Shipp*, 392 F.Supp.3d at 311–12; *Disla Ramos*, 2022 WL 17830637, at *11; *Nejad*, 436 F. Supp. 3d at 732–33.

Valentin's motion to suppress his iCloud backup is accordingly denied.

### 3.    Boone's Motion to Suppress

Boone moves to suppress four warrants obtained by the government for CSLI relating to his phone with a number ending in 9299, his iCloud account, and other cellular data. *See* Boone Mot. 14–20. As explained below, the motion is denied.

Boone devotes the bulk of his argument to the warrant pertaining to the 9299 Phone. He argues that the 9299 warrant is defective because (1) it was obtained on the basis of evidence obtained as a result of the purportedly deficient Valentin search warrants, (2) Agent Ford's supporting affidavit contained a material misstatement, and (3) the affidavit failed to establish probable cause that evidence would be found on the phone. These arguments lack merit.

As to the first argument, the Court has already explained that the search warrants for Valentin's iCloud account and CSLI were not deficient, *see* pages 17–28, *supra*, and more importantly, Boone has no standing to object to the searches of Valentin's data. He has not shown

that he has a legally cognizable privacy interest in the CSLI or iCloud backups of someone else's phone.  *See United States v. Dore*, 586 F. App'x 42, 46 (2d Cir. 2014).  Nor can he vicariously assert Valentin's Fourth Amendment rights.  *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978).

The second argument fails because, though Agent Ford admittedly misstated the time Valentin sent the text messages reading "Yo hit me.  I'm behind." to the 9299 Phone, Boone has failed to show that Ford did so intentionally or with subjective recklessness.  Although Ford's affidavit in support of the 9299 CSLI represent these texts as being sent shortly before the victim was kidnapped, later affidavits explained that they were actually sent during the kidnapping—an error owing to confusion over whether the records were kept in UTC or Eastern time.  See Decl. of Sean Haran, Ex. J ¶ 13 n.3 (Dkt. #60-12).  At the *Franks* hearing, Ford explained that Cellebrite, the program the FBI uses to review returns from cell phone providers, does not have a default time zone setting.  The Cellebrite report timestamped these messages as being sent at approximately 12:30 a.m. on December 10 in "UTC-5."  Ford believed that Cellebrite was showing him the time in UTC and that the parenthetical indicated that he needed to subtract five hours to arrive at EST.  In reality, Cellebrite was already showing him the time in EST, and Ford's additional subtraction of five hours caused him to erroneously report these text messages as being sent at approximately 7:30 p.m. on December 9.  *Franks* Hr'g Tr. 12, 32–33, 95–97.  This testimony credibly establishes that Ford's error was an innocent or negligent mistake, rather than the product of intentional or subjective recklessness.

Finally, the third argument fails because the affidavit in support of the 9299 warrant makes the requisite showing of probable cause.  Most notably, the communications between the 9299 Phone's owner and Valentin around the time of the kidnapping, coupled with the victim's recollection that there were two vehicles involved in his kidnapping, supports the magistrate

judge's finding that there was a fair probability evidence related to the crime would be found in the 9299 Phone's CSLI.

Boone's motion to suppress the fruits of other warrants rest on the arguments just rejected. Boone seeks to suppress the fruits of three warrants directed at his iCloud account and a warrant for prospective GPS data relating to Boone's location.  He again attacks the relevant warrant affidavits because they include information obtained from Valentin's phone CSLI and from Valentin's iCloud account.  But as explained above, Boone has no Fourth Amendment standing to challenge the warrants for Valentin's data.  Boone also argues that these additional warrants were tainted by Fourth Amendment violations because the relevant affidavits cited information obtained pursuant to the warrant for data pertaining to the 9299 Phone.  But as explained above, agents lawfully obtained that CSLI data.  Accordingly, Boone has identified no defect in the additional warrants pertaining to his phone and iCloud accounts.

Boone's motion to suppress the challenged warrants is denied.

### 4.    Jarrett Bruce's Motion to Suppress

Jarrett Bruce moves to suppress the fruits of two search warrants obtained by the government for CSLI relating to his phone with a number ending in 9462 and for his iCloud account.  *See* Jarrett Bruce Mot. 2–5.

Bruce's challenges to these warrants lack merit.  His first ground for suppression—that these warrants were tainted by evidence obtained via the purportedly defective Valentin warrants—has already been addressed by the Court's analysis of Boone's motion.  *See* pages 28–29, *supra*.

Bruce next argues that the fruits of these warrants should be suppressed because the affidavits failed to mention that the victim told law enforcement agents that he did not believe the

30

financial dispute he had with Jarrett Bruce was a sufficient motive for the kidnapping, and because while the affidavit in support of the iCloud warrant stated that Bruce was in the vicinity of the victim's apartment half an hour before the kidnapping, it failed to mention his permanent address was near the victim's apartment. These arguments fail because neither of the two omissions are material. Even adding them to the warrant, *see Lauria*, 70 F.4th at 125–26, there is more than enough other material to establish probable cause to search Jarrett Bruce's CSLI data and iCloud account.

Finally, Jarrett Bruce, like Valentin, argues that the failure to include a temporal restriction on the search of his iCloud account rendered it overbroad. The case for an unbounded search is stronger for Jarrett Bruce's iCloud account than it was for Valentin's. Agent Ford's affidavit reasoned that the three-way kidnapping conspiracy between Valentin, Boone, and Jarrett Bruce had its origins in a dispute Jarrett Bruce had with the victim originating several months before the kidnapping. Further, based on the evidence obtained from Valentin's, Boone's and the victim's phones, Ford's affidavit also identified that Jarrett Bruce's iCloud account would contain evidence of narcotics distribution and conspiracy to distribute narcotics—crimes not limited to the four-day span in December that serves as the locus of the kidnapping charges. *See* Jarrett Bruce iCloud Warrant ¶¶ 4, 24. Accordingly, at minimum, the warrant for Bruce's phone falls under the good-faith exception to the exclusionary rule for the same reasons as the warrant for Valentin's iCloud account.

Jarrett Bruce's motion to suppress the challenged warrants is denied.

## II.    Valentin's and Boone's Motions to Suppress Post-Arrest Statements

Valentin and Boone each move to suppress statements made to the FBI following their respective arrests. Valentin moves to suppress any statements in a custodial interrogation

following his arrest that were made before he was given a *Miranda* warning. *See* Valentin Mot. 35–38. The government has indicated that it "does not intend to introduce in its case-in-chief any statements made by Valentin to the FBI prior to being read his *Miranda* rights." Gov't Opp'n 16. Valentin's motion to suppress these statements is accordingly denied as moot without prejudice to renewal.

Boone moves to suppress his entire post-arrest, video-recorded statement, arguing that his *Miranda* waiver was not voluntary and that the government violated his right to a speedy presentment. *See* Boone Mot. 6–14. This motion is denied.

### A.    *Miranda* Waiver

#### 1.    Legal Standard

"A statement made by the accused 'during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived *Miranda* rights when making the statement.'" *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (brackets omitted) (quoting *Berghuis v. Thompkins*, 560 U.S.370, 382 (2010)). "The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Berghuis*, 560 U.S. at 382–83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). A court "look[s] at the totality of circumstances surrounding a *Miranda* waiver and any subsequent statements to determine knowledge and voluntariness." *Taylor*, 745 F.3d at 23.

Only the voluntariness prong of the waiver inquiry is at issue here. The key question for voluntariness is whether, under the totality of the circumstances, "the defendant's will was overborne by the police conduct." *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018). Courts

generally consider three sets of factors: "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Ibid.* (citation omitted).  The relevant characteristics of the individual include his "experience and background, together with [his] youth and lack of education or intelligence." *Green v. Scully*, 850 F.2d 894, 902 (2d Cir. 1988).  "[T]he conditions under which a suspect is questioned" include "the place where an interrogation is held, . . . the length of detention, . . . [and] [t]he presence or absence of counsel." *Ibid.*  Factors bearing on law enforcement officials' conduct—the "most critical circumstance"— "include the repeated and prolonged nature of the questioning or the failure to inform the accused of his constitutional rights, whether there was physical mistreatment such as beatings, or long restraint in handcuffs, and whether other physical deprivations occurred such as depriving an accused of food, water or sleep, or even of clothing for a prolonged period." *Ibid.*  In addition, courts consider whether law enforcement used "psychologically coercive techniques such as brainwashing or promises of leniency or other benefits." *Ibid.*

### 2.    Analysis

Boone's motion to suppress his post-arrest video-recorded statement because his *Miranda* waiver was coerced lacks merit.

Based on the totality of the circumstances, Boone's waiver of his *Miranda* rights was voluntary and not coerced.  As to Boone's characteristics, Boone "is an adult, there is no evidence that he lacks maturity or intelligence, and he has ample experience with state criminal justice systems." *United States v. Rodriguez*, No. 18-CR-444 (NGG), 2019 WL 112621, at *7 (E.D.N.Y. Jan. 4, 2019); *see Haak*, 884 F.3d at 414–15 (relevant characteristics of a defendant include age, maturity, intelligence, and familiarity with the criminal justice system).  When presented with a *Miranda* waiver, Boone verbally expressed that he understood his rights already and seemed

33

exasperated by the formality of having them read aloud.  Decl. of Sean Haran, Ex. F 26:50–27:31.
And he repeatedly stressed his own criminal history and experience to the interviewing officers.
Accordingly, "the characteristics of the accused," *Green*, 850 F.2d at 902, strongly point toward
an individual who was well-versed with the legal system and who was not cowed by Agent Ford
and Detective Schiavone.

Second, the circumstances of the interview weigh against a finding of coercion.  The
interview lasted less than an hour and a half and was conducted in a standard interview room.  The
two officers were dressed in casual clothes, and the tone was cordial—the officers never raised
their voices, and Boone never appeared stressed, intimidated, or confused.  *See Haak*, 884 F.3d at
415 (finding these factors weigh in favor of voluntariness).  While Boone's left wrist was cuffed
to the wall, *see Parsad v. Greiner*, 337 F.3d 175, 184 (2d Cir. 2003) (finding relevant that the
defendant was not handcuffed); *Haak*, 884 F.3d at 415 (same), the circumstances of the interview
as a whole were not overbearing.  Aside from the "compelling pressures" inherent to all custodial
interrogations, *Miranda v. Arizona*, 384 U.S. 436, 467 (1966), the circumstances of the interview
lean against a finding of coerciveness.

Third, the conduct of the law enforcement officers—the "most critical" factor, *Green*, 850
F.2d at 902—also weighs against a finding of coercion.  As previously described, the officers' tone
was cordial, and they never threatened or physically confronted Boone.  Boone principally argues
that by describing the severity of Boone's charges, the strength of the evidence against him, and
the potential leniency that would come from cooperating—all before he was given a *Miranda*
warning—the officers "presented [him] with a binary choice: waive your rights now, or forever
lose the opportunity to cooperate and forego all the attendant benefits that come with it."  Boone
Mot. 10.  But, far from a threat, the officers' comments simply conveyed the accurate message that

34

Boone faced serious charges carrying stiff penalties that he could potentially alleviate by cooperating—now or in the future. "[T]here is nothing improper in police truthfully telling a defendant that he will be prosecuted to the full extent of the law if he chooses not to cooperate." *Haak*, 884 F.3d at 412; *see United States v. Bye*, 919 F.2d 6, 9–10 (2d Cir. 1990) (collecting cases for the proposition that "the mere mention of the possible sentence facing a defendant and the benefits to be derived from cooperation [does not] convert[] an otherwise proper encounter between the police and the accused into a coercive and overbearing experience"); *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) (explaining that "statements to the effect that it would be to a suspect's benefit to cooperate are . . . common sense factual observations" and "not improperly coercive"). The officers' statements were not improperly coercive.

Boone also objects to certain supposed misrepresentations of the evidence made by the officers. *See* Boone Mot. 11. Misrepresentations about the strength of the evidence by police is relevant to the voluntariness inquiry. *Frazier v. Cupp*, 394 U.S. 731, 737, 739 (1969). But they are not alone dispositive—a court must still examine the totality of the circumstances surrounding a defendant's waiver for voluntariness. *Ibid.*; *accord United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991). Here, it is clear that any inaccurate statements by the officers affected Boone little, if at all. In response to the officers' statements about the strength and source of their evidence, Boone repeatedly—often sarcastically—stated that he did not believe them and vigorously maintained his own innocence.

Examining the totality of the circumstances, defendant's waiver of his *Miranda* rights was voluntary. Boone's motion to suppress his post-arrest statement is denied.

### B.    Speedy Presentment

### 1.    Legal Standard

Federal Rule of Criminal Procedure 5(a)(1)(A) "requires law enforcement to present arrestees [to a magistrate judge] 'without unnecessary delay.'"  *United States v. Gonzalez*, 764 F.3d 159, 167 (2d Cir. 2014) (quoting Fed. R. Crim. P. 5(a)(1)(A)).  Rule 5(c)(2) states that, if the defendant is arrested in a district other than the one where the offense was committed, the initial appearance must be either in the district of arrest or in an adjacent district, if "(i) the appearance can occur more promptly there; or (ii) the offense was allegedly committed there and the initial appearance will occur on the day of arrest."  The remedy for a violation of Rules 5(a)(1)(A) and 5(c)(2) is suppression of any "prejudicial, post-arrest evidence" obtained in violation of the rules. *United States v. Peeples*, 962 F.3d 677, 687 (2d Cir. 2020).  However, 18 U.S.C. § 3501(c) provides a safe harbor that "bars suppression based on an unreasonable delay if the [self-incriminating statement] was made 'within six hours immediately following [the defendant's] arrest or other detention.'"  *Gonzalez*, 764 F.3d at 167 (quoting 18 U.S.C. § 3501(c)).  If the statement was made outside the six-hour period, "the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb–Mallory* cases, and if it was, the [statement] is to be suppressed."  *Ibid.* (quoting *Corley v. United States*, 556 U.S. 303, 322 (2009)).

### 2.    Analysis

Boone moves to dismiss his post-arrest statements because, though he was arrested in New Jersey in the afternoon of January 31, 2024, he was only brought before a magistrate judge to be arraigned at approximately 4:00 p.m. the next day, in the Eastern District of New York.  But because his entire interview occurred within the six-hour safe harbor following his arrest

36

established by 18 U.S.C. § 3501(c), suppression of the interview is not warranted.  Boone's motion is denied.

### III.    Valentin's Motion to Suppress Witness Identifications

Valentin moves to suppress out-of-court identifications made by two witnesses in this case. *See* Valentin Mot. 31–35.  The motion is denied.

#### A.    Legal Standard

"Identification evidence is admissible if the pretrial identification procedure was not unnecessarily suggestive or if the identification is independently reliable."  *McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 74 (2d Cir. 2011).  To succeed on a motion to suppress, a defendant must show both that (1) the identification procedure was unnecessarily suggestive and (2) that the identification was not independently reliable.  *See ibid.*

On the first prong, the defendant bears the burden of showing by a preponderance of the evidence that an identification procedure is unduly suggestive, meaning that it "create[d] 'a very substantial likelihood of irreparable misidentification.'"  *Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)); *see United States v. Brown*, No. 12-CR-103 (WMS) (JJM), 2015 WL 13882307, at *4 (W.D.N.Y. Nov. 3, 2015) (as to the burden of proof).

On the second prong, if an identification procedure is found to be unnecessarily suggestive, the burden shifts to the government to show that the resulting identification is nevertheless admissible because, under the totality of the circumstances, it is "independently reliable."  *Brisco*, 565 F.3d at 89; *see Brown*, 2015 WL 13882307, at *4 (as to the burden of proof).  In making that determination, courts must "weigh the corrupting effect of the suggestiveness against other factors indicating that the identification may be independently reliable, for even a suggestive procedure

37

does not in itself intrude upon a constitutionally protected interest if it did not contribute significantly to the identification of the defendant." *Raheem v. Kelly*, 257 F.3d 122, 135 (2d Cir. 2001) (brackets, quotation marks, and citations omitted).   In performing that analysis, courts balance the five factors set out in *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972):

> [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

*See United States v. Diaz*, 986 F.3d 202, 207 (2d Cir. 2021).   "None of these factors standing alone is dispositive of the existence of independent reliability; instead, reliability is assessed 'in light of the totality of the circumstances.'"   *Brisco*, 565 F.3d at 89 (quoting *Raheem*, 257 F.3d at 135).

###### B.    Analysis

Boone moves to suppress out-of-court identifications made by two witnesses in this case as the product of unduly suggestive and unreliable identification procedures.   This motion is denied.

The Court need not address whether either identification procedure was unduly suggestive because examination of the *Biggers* factors shows that both witnesses' identifications were independently reliable.   The auto owner's identification can be easily dispensed with.   With respect to the opportunity of the witness to view Valentin, the witness stated that he had seen Valentin at his shop "all the time" and had seen Valentin driving the green Ford Explorer "all around town for months now."   *Cf. Wiggins v. Greiner*, 132 F. App'x 861, 865 (2d Cir. 2005) (finding a prior identification independently reliable where witness "had seen [the defendant] in the neighborhood two or three occasions per week over a period of seven months").   As to the witness's degree of attention and level of certainty, the witness told the officers specific details that evinced a high

degree of familiarity with Valentin, including descriptions of the vehicles Valentin had been seen driving, that Valentin was friends with one of the owner's employees, and that Valentin had been released from prison recently.  These factors suffice to show that the auto owner's identification of Valentin was independently reliable, notwithstanding the procedures used.

As for the Linkn Wireless employee, the *Biggers* factors likewise point to reliability.  Like the auto shop owner, the cell phone store employee was previously familiar with Valentin—she picked his photo out of a six-photo line-up, identifying him as someone she had seen him in the store "on numerous occasions."  Decl. of Benjamin Yaster, Ex. K.; *see Wiggins*, 132 F. App'x at 865.  Further, the surveillance photo from within the Linkn Wireless store on December 12 shows that she had the opportunity to view the customer who purchased the 9980 Phone uninterrupted for several minutes.  *Cf. United States v. Wong*, 40 F.3d 1347, 1360 (2d Cir. 1994) (finding witness had sufficient opportunity to view defendant after "staring him in the face for two to three seconds" (quotation marks and brackets omitted)).  As to the witness's degree of attention, it is likely true, as Valentin argues, that an employee conducting a transaction in the routine course of business would not pay as close attention to a customer as someone who knows they are witnessing a crime.  But the circumstances of the identification here suggest that the employee paid special attention to Valentin, given that she registered that Valentin was a repeat customer and had demonstrated notable behavior in the past—purchasing multiple flip phones, always in cash.  Finally, though about two months elapsed between the December 12 purchase and her identification, a gap of a few months is not fatal to a finding of independent reliability, where other indicia of reliability are present.  *See, e.g.*, *Diaz*, 986 F.3d at 208 (three months); *United States v. Jacobowitz*, 877 F.2d 162, 168 (2d Cir. 1989) (ten months); *United States v. Williams*, 596 F.2d 44, 49 (2d Cir. 1979)

(two years and eight months).  Under the totality of the circumstances, the Linkn Wireless employee's identification of Valentin was independently reliable.

Because the government has shown that both witnesses' out-of-court identifications were independently reliable, Valentin's motion to suppress these identifications is denied.  Valentin's request for a *Wade* evidentiary hearing is likewise denied.  *See Dunnigan v. Keane*, 137 F.3d 117, 128–29 (2d Cir. 1998) ("Where there is a contention that the pretrial identification was the result of impermissibly suggestive procedures, a *Wade* hearing is advisable; but the Supreme Court has made it clear that there is no '*per se* rule compelling such a [hearing] in every case.'" (quoting *Watkins v. Sowders*, 449 U.S. 341, 349 (1981)), *abrogated on other grounds by Perry v. New Hampshire*, 565 U.S. 228 (2012); *see, e.g.*, *United States v. Scott*, No. 21-CR-429 (AT), 2021 WL 4125212, at *3 & n.3 (S.D.N.Y. Sept. 9, 2021) (denying request for a *Wade* hearing after determining that the challenged identification was independently reliable); *United States v. Sosa*, No. 17-CR-580 (NRB), 2018 WL 4659472, at *3 (S.D.N.Y. Sept. 12, 2018) (same).

## CONCLUSION

For the foregoing reasons, Lesly Valentin's, Jarrett Bruce's, and Aasim Boone's respective motions to suppress are denied.

SO ORDERED.

     /s/  Rachel Kovner
RACHEL P. KOVNER
United States District Judge

Dated: May 28, 2025
       Brooklyn, New York