UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

UNITED STATES OF AMERICA

         v.

LESLY VALENTIN, JARRETT BRUCE,
AASIM BOONE, and GREGORY BRUCE,

         Defendants.

------------------------------------------------------x

**MEMORANDUM AND ORDER**
23-CR-292 (RPK)

RACHEL P. KOVNER, United States District Judge:

A jury convicted defendants Lesly Valentin, Aasim Boone, and Jarrett Bruce of conspiracy to kidnap an individual for ransom. The jury also convicted Valentin of transmitting communications across state lines with intent to extort and Boone of attempted obstruction of justice. Defendants move for judgments of acquittal, and Bruce and Valentin seek new trials. The motions are denied.

## BACKGROUND

The fourth superseding indictment in this case charged Boone, Bruce, and Valentin in four counts. Count One charged Boone, Bruce, and Valentin with conspiracy to kidnap for ransom. Fourth Superseding Indictment ¶¶ 1–2 (Dkt. #126). Count Two charged Valentin with sending text messages to the kidnapping victim that threatened to injure him and his family unless he paid a reward. *Id.* ¶ 3. Count Three charged Jarrett Bruce and his brother Gregory Bruce with witness tampering and obstruction of justice. *Id.* ¶ 4.[*]

---

[*] For convenience, Jarrett Bruce is referred to in this opinion as "Bruce," but his brother is referred to as "Gregory Bruce."

Count Four charged Boone with attempting to obstruct the ensuing criminal investigation by asking his then-girlfriend Charle Sampson to delete her Apple iCloud account. *Id.* ¶ 5. The case was tried before a jury in June 2025.

### A.    Pre-Trial Laptop Access

In orders between October 2024 and January 2025, the Court granted the requests on behalf of the incarcerated defendants that they be provided laptops for the review of discovery materials while in custody. Oct. 16, 2024 Order; Oct. 22, 2024 Order; Jan. 10, 2025 Order.

In the time between those orders and the final pretrial conference in June 2025, one of the three incarcerated defendants—Lesly Valentin—raised a laptop access concern. In April 2025, Valentin's counsel submitted a letter stating that the Metropolitan Detention Center ("MDC") had not granted Valentin "anything close to daily access" to the laptop and that he had been able to view discovery on the laptop on "less than ten occasions." Valentin Letter (Dkt. #157). In response, the government stated that the MDC's Legal Department had first learned of this access concern the day before counsel had submitted his letter to the Court. The government stated that since that time, the MDC Legal Department had communicated with other MDC staff about "ensuring that Valentin has regular access to his discovery laptop," and that the MDC Legal Department "understands that Valentin will have regular access to the discovery laptop going forward." Gov't Response (Dkt. #159). The Court denied Valentin's motion to compel further access in view of those representations. Apr. 9, 2025 Order.

Neither Valentin nor his co-defendants raised concerns about laptop access again until the final pretrial conference on June 12, 2025. At the close of that conference, Valentin (speaking on his own behalf rather than through counsel) told the Court that "a few of us . . . didn't get to review discovery, laptops still didn't come." Pretrial Conf. Tr. 60:22–25 (Dkt. #244). Jarrett Bruce (also speaking on his own behalf) then asserted that "[t]he laptop sent to MDC . . . was broke, and it was

2

sent back," and that he had "never received" another laptop. *Id.* at 61:3–4. Bruce acknowledged reviewing discovery with his attorneys at the MDC, but objected that he had insufficient time for that review. The Court indicated it was having difficulty squaring the statements regarding absent laptops with the concerns previously expressed on Valentin's behalf about having adequate time to use his laptop, but asked the government to investigate Mr. Bruce's laptop access. *Id.* at 62:17–63:9. The Court also asked defense counsel to advise the Court of whether there was any further relief being sought. *Id.* at 63:9–11.

On the first morning of trial, the government reported that it had confirmed Mr. Bruce's laptop had been delivered to the MDC, that the laptop had not been returned, and that MDC had not received reports of any issue with the defendants' laptops in the period leading up to trial. Trial Tr. 22:1–6. MDC's legal department advised the government "that the first time they heard an issue from Mr. Bruce about his laptop was on Monday, and they said they communicated to him that the laptop was available to him to review." *Id.* at 28:17–21. The government further stated that it had asked Mr. Bruce's counsel if there was any relief he was seeking from the government, and counsel had said no. *Id.* at 22:6–9. Finally, the government relayed its "understanding . . . that Mr. Bruce has been regularly receiving visits from a paralegal who has been providing him with access to discovery in this case." *Id.* at 22:9–15.

The Court asked defendants to confer during a break in trial and "let me know if there's something that you want me to do." *Id.* at 23:20–22. Defendant Jarrett Bruce (speaking on his own behalf rather than through counsel) stated that he was "asking for a dismissal of the indictment," but the Court advised him that because the defendants were represented, "any kind of motion would have to come through counsel." *Id.* at 25:16–26:24.

3

Defendants' counsel did not seek to adjourn the trial and did not make any further request for relief from the Court. The next time any defendant raised a concern regarding the laptops or other discovery was on the last day of trial—following the presentation of all the evidence—when Bruce (speaking on his own behalf, rather than through counsel) stated that he had not seen "[a] lot of the evidence that was shown today . . . in [his] discovery." *Id.* at 1566:13–19.

**B.      The Evidence at Trial**

**1. The Kidnapping**

The government sought to establish that on Friday, December 9, 2022, Valentin, Bruce, and Boone executed a plan to kidnap Shaon Khaled from his Queens apartment and extort Khaled's friends for ransom. *Id.* at 42:7–17. To support that theory, it offered testimonial, photo, video, cell-site location, and cell-phone-record evidence placing the defendants near key events on the night of the kidnapping.

The government began with Khaled's testimony. Khaled, a marijuana dealer from Queens, testified that he had parked his car outside his Astoria apartment at 8:00 p.m. when a masked man wearing a black outfit and white shoes approached. *Id.* at 82:12–13, 83:4–17. The man hit Khaled with a black object and threatened to kill him if he moved. *Id.* at 84:7–12. He ordered Khaled to enter a red minivan, which had "pull[ed] up with the doors open." *Id.* at 84:16–24. Khaled struggled to escape, prompting the assailants to force him inside. *Id.* at 84:25–26. In the scuffle, his phone fell out of his pocket. *Id.* at 85:12–13. Khaled saw three people in the car, who bound his arms and demanded $500,000. *Id.* at 86:13–26, 87:1–21. They beat him when Khaled said he did not have the money. The man in the white shoes cut Khaled's ear and burned him with a lighter. *Id.* at 88:9–15.

Khaled recalled that the minivan drove off and made a stop, where the men pulled him from the car. *Id.* at 92:6–8. He noticed that a silver sedan with its lights on had parked closely

behind the van. *Id.* at 96:20–97:3. He also overheard one assailant make a phone call and ask: "Hey, can we come by to your place?" *Id.* at 93:19–21. They then doused Khaled in bleach, put him back in the minivan, and drove to another stop. At some point, Khaled offered the assailants money and marijuana if they would release him. *Id.* at 94:19–24. They accepted the offer. But when he asked to be dropped off at his apartment to get money, the assailants refused because there were "too many cops there." *Id.* at 95:7–8. They instead deposited Khaled in Manhattan around 1:00 a.m. and told him they would call him on Monday. *Id.* at 97:6–23.

The government suggested that Bruce had a motive to kidnap Khaled. Khaled testified that he had previously sold Bruce a "dealer plate," a license plate used by car dealerships that could be easily transferred between cars. *Id.* at 114:8–14. Bruce complained that officers arrested him while he was driving a car with one of Khaled's plates. *Id.* at 114:24–115:1. Claiming Khaled had sold him fake plates, Bruce demanded that Khaled pay his legal fees. *Id.* at 115:14–23. Khaled issued Bruce a refund but refused to pay for Bruce's lawyer. *Id.* at 115:21–25.

The government corroborated Khaled's account with video evidence from security cameras around his apartment complex. They recorded a red Chrysler Pacifica minivan backing down an alley near Khaled's apartment building around 7:37 p.m. *Id.* at 209:5–7, 212:21–25; GX202. Eleven minutes later, a masked individual with a black outfit and white shoes walked down the same alley. GX203; GX201 at 12:40–13:00. At 8:01 p.m., the victim's vehicle parked in the alley. Trial Tr. 210:7–12. The cameras then recorded the masked man, now with an associate, re-enter the frame three minutes later and force Khaled into the red minivan. *Id.* at 211:4–10; GX201 at 28:30–50. The masked man appeared to strike Khaled multiple times. Trial Tr. 211:11–15. The minivan then drove off. Later at 12:43 a.m., a different camera in Manhattan recorded a red Chrysler minivan pulling over near 62nd Street and First Avenue. *Id.* at 1101:1–1103:6. Detective

5

Christofer Schiavone, who worked on the investigation, testified that he believed the kidnappers released Khaled then. *Id.* at 1103:14–18.

License-plate reader ("LPRs") records provided further corroboration of Khaled's account. Detective Nicholas Loccisano, testifying for the government, described looking up the minivan's license plate in state LPR databases. *Id.* at 212:15–17, 228:3–18. Records showed that at 8:08 p.m.—four minutes after Khaled's seizure—an LPR recorded the minivan crossing the Triborough Bridge from Queens. *Id.* at 284–85. At 8:21 p.m., the van crossed the George Washington Bridge from Manhattan into New Jersey. *Id.* at 285. Because the minivan's plate was not captured by any other LPRs even though video footage showed it was in Manhattan at midnight, Schiavone believed its license plate was swapped that night. *Id.* at 1106:5–10.To connect the vehicles to the defendants, the government introduced LPR data indicating that a gray sedan associated with Boone was present when the assailants seized Khaled and when they later released him. At 7:31 p.m., an LPR captured a gray Honda Accord on "the Queens side of the" Triborough Bridge. GX602 at 12; Trial Tr. 287:24–288:4. Angela Sampson, the mother of Boone's girlfriend Charle, testified that she had purchased that Accord for her daughter. Trial Tr. 467:9–16. Another LPR captured the sedan at 8:09 p.m. crossing the George Washington Bridge into New Jersey—shortly before the minivan made the same crossing. *Id.* at 288:17–21. Cameras later saw the sedan re-enter Manhattan at 9:10 p.m., head to the Bronx at 9:23 p.m., double back toward Manhattan at 12:16 a.m., and return to New Jersey at 1:11 a.m. *Id.* at 289:17–24, 290:3–10, 291:1–15. The government claimed that the sedan was therefore in Queens at the time of Khaled's 8:00 p.m. kidnapping and in Manhattan during his 1:00 a.m. release.

The government next introduced cell-site data demonstrating that the defendants' cell phones were near each stage of Khaled's kidnapping. Agent Elizabeth Wheeler, an expert witness

6

for the government, explained that cell phones typically connect to a cell site, or a "grouping of antennas that emit radio frequency in a certain direction," when making calls or texts. *Id.* at 264:4–265:1, 347:17–21. Each cell site covers a sector of land bounded by the radio waves' range. A record that a phone connected to a cell site would imply that the phone was within the cell site's service area.

Cell-site data and text messages extracted from Valentin's iCloud account suggested that the defendants met the day before the kidnapping. On December 7, Bruce's phone texted Valentin's phone the address of Bruce's then-girlfriend's home in Englewood, New Jersey. *Id.* at 1146:12–17. The next afternoon, each defendant's cell phone hit a cell tower at that address's vicinity. *Id.* at 301:13–20.

The government then introduced cell-site evidence that Bruce and Boone were near Khaled's apartment during the kidnapping. At 7:28 p.m.—nine minutes before the red minivan arrived at Khaled's apartment—Bruce's phone made three calls using a cell site in Astoria installed by the approach to the Triborough Bridge. *Id.* at 305:25–306:6. At 7:48 p.m., when the masked man arrived at Khaled's apartment, a phone registered to Angela Sampson made a call from a cell site located at the same approach road. GX706 at 10. Two minutes later, the Sampson phone received a voicemail from Boone's phone, connecting to a northern Astoria cell site whose antennae faced the Triborough Bridge. *Ibid.* Given the sequence of two calls, Wheeler opined that the Sampson phone was likely in a car driving over the bridge to the Bronx. Trial Tr. 420:16–421:1. Boone's phone, on the other end of the call, used a cell site facing the kidnapping site. GX706 at 10. The government theorized that Sampson had driven Boone to Astoria.

Cell-site data connected Boone to the minivan as it left Queens. At 8:25 p.m.—four minutes after LPRs detected the minivan crossing the George Washington Bridge—cell sites

placed Bruce's phone near the bridge's New Jersey offramp.  GX706 at 11.  A minute later, Boone's phone called the Sampson phone using a cell site on the bridge's approach road.  *Ibid.* The Sampson phone received the call from a cell site serving Angela Sampson's home in Englewood.  *Id.* at 13.  Twenty-six minutes later, the Boone phone connected to the same cell site in Englewood.  *Ibid.*  The government submitted that consistent with Khaled's testimony, Boone drove the minivan to New Jersey and asked Charle Sampson to park it at Angela Sampson's home.

The government next produced cell-site evidence suggesting that Boone took the Sampson phone and used both phones to obfuscate cell-site records.  Between 9:36 p.m. and 9:40 p.m., a phone number ending in 1045 called both the Boone and Sampson phones—generating records from nearby or co-located cell sites in Westchester County.  Trial Tr. 317:16–20; GX706 at 15.  In Wheeler's opinion, the two phones' use of the same or nearby cell sites indicated that they were traveling in a vehicle together.  *Id.* at 331:21–25.  Confirming this point, she described how Boone's phone called Bruce's phone at 10:55 p.m. using a cell site pointing toward a section of the Cross Bronx Expressway.  *See id.* at 316:25–318:6; GX706 at 14.  Sampson's phone received a call from Bruce five minutes later using the same cell site.  The government submitted that Boone controlled both phones, using one for outbound and the other for inbound calls.

Further cell-site data suggested, in the government's eyes, that Bruce coordinated the ransom payment with Boone.  Humayen Khan, a mutual friend of Khaled and Bruce, testified that he was a wealthy individual who had previously loaned Bruce tens of thousands of dollars.  *Id.* at 643:2–6.  On the night of the kidnapping, he claimed to have received a message from the superintendent of Khaled's apartment that "some people grabbed [Khaled] and put him in a car." *Id.* at 638:8–10.  Khan asked Bruce and another friend to meet in Jackson Heights.  *Id.* at 638:16–24.  While the three awaited news of Khaled, Bruce and the friend advised Khan to pay "whatever

they're going to demand." *Id.* at 640:14–16. Khan also testified that Bruce tried to discourage him from calling the police, but that he did so anyway. *Id.* at 641:13–15. Finally, Khan observed that Bruce was frequently on his phone that night but claimed he was talking to some "girl he was supposed to meet." *Id.* at 641:22–23.

The government introduced evidence that Bruce was coordinating with Boone, not a paramour. Bruce's phone used Jackson Heights cell sites to make or receive calls between 10:24 p.m. and 11:00 p.m. to or from the Boone and Sampson phones. *Id.* at 319:8–15; GX706 at 14. But at 12:23 a.m., it called Boone's phone from New Jersey. GX706 at 14. Boone received that call from a cell site pointing toward the Harlem River Drive in upper Manhattan—seven minutes after an LPR captured the gray Accord entering the borough. GX706 at 16; Trial Tr. at 333:16–17; GX1302 at 3. As the government saw it, Bruce had informed the assailants that Khan had called the police, prompting them to drop Khaled off in Manhattan. Trial Tr. 1622.

The government next presented cell records suggesting that Valentin was in the gray Accord and tailing Boone in the minivan. Valentin's phone had generated no records from 7:00 p.m. to 12:21 a.m. GX107 at 29. iCloud account records extracted from his phone suggested that at 12:23 a.m., Bruce's phone was used to send Valentin's phone Boone's phone number. GX105-C; Trial Tr. 1159:1–1160:20. Afterward, Valentin texted Boone's number: "Yo hit me I'm behind." GX106; GX1302 at 3. At 12:27 a.m., Valentin's phone then connected to a cell site in Astoria—also pointing across the East River toward the Franklin D. Roosevelt Drive—to receive a call. Trial Tr. 320:12–17. Because cell signals carry farther across water, and because both Valentin's and Boone's calls used cell sites pointing toward roadways on Manhattan's eastern edge, Wheeler believed Valentin and Bruce could be in nearby cars on the Harlem River Drive. *Id.* at 333:1–334:3.

9

The government offered evidence that Boone was the man in the white shoes. Detective Schiavone testified that on his review of the security footage that the individual in the white shoes was "taller than the minivan." *Id.* at 1290:17–21. Boone, who was over six feet tall, GX235-X, fit the assailant's build. The government also presented images indicating that Boone owned black pants, a black sweatshirt, and a pair of white shoes. Trial Tr. 1243:15–16, 1244:18–19.

The government also introduced recordings of Boone's post-arrest statements to support its theory that Boone used multiple phones. The agents mentioned during Boone's post-arrest interview that they "had reviewed information on his iCloud account." *Id.* at 1236:20–23. But Boone told FBI agents he would never do "stupid shit on my regular phone." GX235-VII. But "maybe [he would use] a bitch's name . . . [or] maybe I got a girl who'll open up a line for me." *Ibid.* Later, he muttered that he had "got to see her phone, she got anything December 9th." GX235-IX. Schiavone understood Boone to refer to Charle Sampson. Trial Tr. 1225:9–11.

The government also presented a recorded call between Boone and Charle Sampson. In that call, Boone recounted that Bruce told him he should have told the FBI he was in Queens on December 9 to purchase marijuana. GX545-I; *see* Trial Tr. 1437:18–23.

In addition, the government introduced testimony from Angela Sampson, who claimed that Charle had once called her during a fight with Boone. Boone grabbed the phone during the call and told Sampson: "Let me tell you how I had a man tied up in front of your house in a van." Trial Tr. 468:16–18. During another altercation, Boone told Sampson he put people "in vans, tie[d] 'em up and cut their ears off." *Id.* at 469:18–19.

The government finally argued that the defendants tried to destroy evidence linking them to the kidnapping. Text messages from Valentin's iCloud account indicated that he tried to sell a van on December 14. *Id.* at 1215:19–1216:13. As to Boone, Schiavone testified that law

Case 1:23-cr-00292-RPK    Document 280    Filed 07/20/26    Page 11 of 28 PageID #: 4937

enforcement searched Boone's iCloud account but found no information "from the second half of 2022" other than a login on December 12, suggesting Boone had deleted his account. *Id.* at 1238:9–11, 1240:16–1241:5.

The defense argued that there was reasonable doubt because it was possible that Boone and Valentin were arranging drug deals rather than a kidnapping, and that Bruce was in Astoria to comfort Khan rather than help coordinate the crime. *See id.* at 54:2–7, 61:18–23, 1699. To support that theory, the defense offered alternative accounts for the cell site and video evidence offered at trial. They argued on cross-examination that Bruce's home in Queens was "much closer to the cell site that the Boone phone" hit at 7:50 and 7:53 p.m.—suggesting Boone was at Bruce's home and not Khaled's apartment. *Id.* at 429:10–20. The defense also suggested that because Valentin's phone connected to an Astoria cell site at 12:27 a.m., he was more likely to be in Astoria rather than in Manhattan behind the red minivan.

Bruce's counsel questioned the reliability of the cell-site data and noted that Khaled "could not identify his kidnappers" or recognize their voices, even though Khaled and Bruce were longtime friends. *Id.* at 1649–51. He proposed that the cell-site data was consistent with Bruce visiting his girlfriend—who lived at the same address he texted Valentin—the day before the kidnapping, and living at home in Astoria the day of the kidnapping. *Id.* at 1688. Boone's counsel argued that his client did not match the description of the man in the white shoes. *Id.* at 1708–10. He also argued that the government could not explain why the man in the white shoes arrived in a black sedan. *Id.* at 1710. And because cell-site data showed that Boone's phone skipped over cell towers much closer to Khaled's apartment, Boone's attorney suggested that his client was more likely at Bruce's home that night to purchase marijuana. *Id.* at 1713–14. Under counsel's reading of the cell-site data, Charle Sampson drove the marijuana back to New Jersey while Boone dealt

11

drugs in Westchester and in the Bronx. *Id.* at 1748. Finally, Valentin's counsel suggested that the defendants did not coordinate a kidnapping because Valentin never spoke with Bruce on the morning of the kidnapping or the weekend after. *Id.* at 1782, 1789–90. He also introduced messages from Valentin's iCloud account relating to drug sales and argued that Valentin's communications with Boone and Bruce were "about drug[]" transactions, not a kidnapping conspiracy *Id.* at 1786–87. Counsel also emphasized that Valentin's phone did not exhibit any activity from 7:00 p.m. to 12:21 a.m.

### 2. The Threats

The government sought to show that Valentin sent Khaled text messages threatening him in order to obtain payment. It first relied on records extracted from Khaled's phone, which he had dropped when he was forced into the car. Text message records indicated that on December 12, a phone number ending in "9980" sent Khaled's cell phone the following text:

> [December 12, 2022, 6:48 p.m.] Are u ready to finish this? I have your instructions for u. Remember how spicy shit gets! Specially 4 n e one around u try some bs. Lmk wen ready for drop location.

GX162 at 1. Detective Schiavone testified that the "9980" number was associated with a prepaid phone purchased from a Linkn Wireless store in Asbury Park, New Jersey, on December 12. *Id.* at 1117:3–16.

The government introduced video evidence suggesting that Valentin had activated that "burner" phone. Detective David Bonacarti visited the Linkn Wireless store and obtained partial security camera footage. It showed that at 2:17 p.m. on December 12, an individual entered the store, spoke to the owner, approached the counter, and handed a phone in his possession to employee Leila Dupree. Trial Tr. 491:19–492:7; GX228. Dupree, testifying for the government, identified Valentin in open court and in a photograph lineup as the individual who entered the

12

store.   Trial Tr. 599:11–600:23, 601:25–602:15.   She explained that she activated the phone Valentin handed to her.  *Id.* at 596:12–18; *see* GX709.

Corroborating Dupree's testimony, Agent Wheeler presented cell-site evidence indicating that the burner phone and Valentin's phone connected to the nearby cell sites at similar times.  On December 12, Valentin's phone made 12 calls between 10:56 a.m. and 11:54 p.m. from cell sites in Asbury Park.  GX706 at 20; Trial Tr. 337:2–8.  The burner phone also connected to Asbury Park cell sites between 3:13 and 3:54 p.m.  *Ibid.*  From 7:00 p.m. to 9:00 p.m., both the burner and Valentin's phone connected to cell sites in Elizabeth, New Jersey.  GX162 at 20.  And on December 13, the burner phone received three texts by connecting to a cell site in Asbury Park at 6:23 p.m.  *Id.* at 21.  Detective Schiavone revealed that the FBI had recovered Khaled's phone and sent those texts to locate the burner phone.  Trial Tr. 1113:8–18, 1309:21–25.  He learned that at 6:25 p.m., Valentin called Bruce and connected to a cell site at the same Asbury Park location. GX162 at 21.  Wheeler suggested that this pattern indicated that Valentin controlled both phones. Valentin's iCloud messages also showed that on December 13, Bruce's phone was used to text Valentin's phone: "Yo make sure you bring the phones."  GX105-I at 66.  Valentin's phone sent "Kopy" as a response.  *Ibid.*

### 3.  The iCloud Account

The government sought to show that Boone attempted to obstruct justice by asking Charle Sampson to delete her iCloud account.  Trial Tr. 45:8–17.  It relied on a recorded call between Boone and Sampson while Boone was in jail.  In the call, Sampson mentioned that her phone was operating slowly, and that she was planning to go to T-Mobile.  Boone replied, "Just delete your iCloud."  GX540-II at 0:05–0:10. When Sampson demurred, Boone said: "no no no.  What I told you before with my shit was a fact, when that n***a said I got your whole iCloud. . . . They are probably on your shit, so just delete your whole shit."  *Id.* at 0:12–0:30.

13

\* \* \*

The jury convicted Valentin, Bruce, and Boone of conspiracy to kidnap Khaled; Valentin of transmission of interstate communications with intent to extort; and Boone of attempted obstruction of justice. It acquitted the Bruces of witness tampering.

Valentin, Bruce, and Boone move for a judgment of acquittal under Federal Rule of Criminal Procedure 29. They argue that the evidence was insufficient to establish beyond a reasonable doubt that they participated in a kidnapping conspiracy, that Valentin transmitted threatening text messages to Khaled with the intent to extort him, or that Boone attempted to obstruct justice. Separately, Valentin and Bruce move for a new trial under Rule 33 on grounds that the government violated the Fifth and Sixth Amendments by failing to provide adequate access to discovery laptops. Valentin attaches an affidavit stating that the MDC regularly denied him laptop access, and an email printout showing Bureau of Prisons employees failing to respond to his lawyer's request for laptop access records. Bruce and Valentin also move for a new trial based on their arguments regarding the trial evidence.

## DISCUSSION

Defendants' motions for a judgment of acquittal and for a new trial are denied.

## I. Defendants Are Not Entitled to Judgments of Acquittal

"A defendant bears a heavy burden when he attacks a criminal conviction on the basis of insufficient evidence." *United States v. Delgado*, 972 F.3d 63, 72 (2d Cir. 2020) (quotation marks and citation omitted). While a court must enter a judgment of acquittal when "the evidence is insufficient to sustain a conviction," Fed. R. Crim. P. 29(a), a conviction will be upheld "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *United States v. Bramer*, 956 F.3d 91, 96 (2d Cir. 2020). In making this assessment, a court must "view the evidence in the light most favorable to the government, crediting every

14

inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Delgado*, 972 F.3d at 72 (citation omitted). "[T]hat inferences consistent with innocence as well as with guilt might be drawn from circumstantial evidence is of no matter to sufficiency analysis because" it is the jury's prerogative to balance competing inferences. *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005). Defendants have not met their heavy burden to overturn the jury's verdict.

### A.    A rational jury could convict Boone of conspiracy to kidnap Khaled.

Boone's motion for a judgment of acquittal on the conspiracy count is denied. Boone argues that a rational jury could not have concluded beyond a reasonable doubt that he conspired to kidnap Khaled. He first argues that the cell-site data placing him in Englewood on December 8 was consistent with his being at home, rather than meeting with Bruce and Valentin to plan a kidnapping. Boone Mot. for Acquittal 5 (Dkt. #268-1). Boone also argues that the cell data best suggests that Boone was dealing drugs on December 9, not kidnapping Khaled.

Boone's argument fails because the jury could conclude from circumstantial evidence that Boone conspired to kidnap Khaled. To convict Boone on this count, the government must show that Boone agreed to kidnap Khaled, "knowingly engaged in the conspiracy with the specific intent to commit the" object offense, and that an "overt act in furtherance of the conspiracy was committed." *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) (citation omitted). The jury's verdict "may be based entirely on circumstantial evidence." *United States v. Friedman*, 300 F.3d 111, 124 (2d Cir. 2002) (citation omitted). Jurors are "entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences." *Huezo*, 546 F.3d at 182. For example, evidence that "the defendant acted together with others to realize a common goal," *United States v. Montour*, 944 F.2d 1019, 1025 (2d Cir. 1991), or was present at "critical stages of the conspiracy that cannot be explained by happenstance," *United States v. Anderson*, 747 F.3d

15

51, 60 (2d Cir. 2014) (citation omitted), may support an inference of an agreement.  Courts review sufficiency challenges "in the context of a conspiracy conviction" with "deference to the jury's findings" given the secretive nature of criminal conspiracies and the consequent necessity of circumstantial evidence.  *United States v. Rojas*, 617 F.3d 669, 674 (2d Cir. 2010) (citation omitted).

Circumstantial evidence permitted the jury to conclude beyond a reasonable doubt that Boone agreed to kidnap Khaled and advanced the agreement by detaining him in the minivan.  The cell-site data placed Boone, Valentin, and Bruce in Englewood the afternoon before the kidnapping.  Considering that data alongside the next day's events, the jury could conclude that Boone acted in coordination with Bruce and Valentin to kidnap Khaled for ransom.  It could draw this conclusion because cell-site data placed Boone at every key event in the kidnapping.  Boone made a call at 7:53 p.m. from a cell site serving the apartment where Khaled lived, minutes before he was seized.  GX706 at 10.  The jury also heard testimony that Boone's physique matched that of the individual seen forcing Khaled into the minivan, and that Boone owned the clothing worn by the masked assailant.  Agent Wheeler further noted that Boone's phone called the Sampson phone through a cell tower covering the approach road to the George Washington Bridge, which the red minivan appears to have crossed around the same time.  *Id.* at 11.  A half hour later, Boone's phone connected to a cell tower that served Sampson's home, consistent with Khaled's recollection that one assailant called someone for permission to go to that person's home.  *Id.* at 12.

The jury was also free to credit Wheeler's opinion that Boone used the Sampson phone after arriving in New Jersey, relying on evidence that multiple phone numbers called the Boone and Sampson phones minutes apart from each other after defendants apparently arrived in New Jersey.  Indeed, Bruce called the Sampson phone five minutes after Boone called Bruce at 10:55

16

p.m.  Trial Tr. 316:25–317:8; GX706 at 14.  The jury could further rely on Boone's statement that he might use a "girl who'll open up a [phone] line for [him]" to execute a complex crime.  GX235-VII.

Finally, the jury could rely on Angela Sampson's testimony that Boone once told her he "had a man tied up in front of [he]r house in a van," *id.* at 468:16–18, as an admission of his participation in Khaled's kidnapping.  Boone also told Sampson during a dispute that he put people "in vans, tie[d] [th]em up and cut their ears off," *id.* at 469:18–19—precisely what Khaled experienced.  In sum, based on the video, cell-site, text message, and testimonial evidence in this case, the jury could rationally find beyond a reasonable doubt that Boone agreed to kidnap Khaled, then executed that scheme the next day.  *See Bramer*, 956 F.3d at 96.

In arguing to the contrary, Boone emphasizes that the government offered no direct evidence that the defendants planned a kidnapping.  Because the jury may base its verdict "entirely on circumstantial evidence," read considering each juror's "common sense and experience in drawing inferences," that argument does not warrant acquittal.  *United States v. Shipp*, No. 19-CR-29 (RPK), 2021 WL 1890041, at *6 (E.D.N.Y. May 11, 2021) (citations omitted).

Boone next argues that the cell-site data at best shows that he was in Queens to purchase marijuana from Bruce.  But the jury could rationally discount this explanation.  First, it could interpret it as pretextual given the recorded jail call where Boone recounted Bruce's advice that he offer the same theory to the FBI agents.  GX545-I.  Second, it could find this explanation implausible considering the cell-site data pinning Boone in New Jersey minutes after the red minivan transported Khaled there, and on the Harlem River Drive when Valentin texted him that he was close by.  GX706 at 11, 14; *United States v. Robinson*, No. 21-2906-CR, 2024 WL 2747143, at *2 (2d Cir. May 29, 2024) (rejecting sufficiency challenge based on cell-site data).

Boone's argument that other cell sites were even closer to Khaled's apartment does not warrant acquittal either.  Wheeler explained that Boone's phone could connect to a cell site farther from Khaled's apartment because its high elevation enabled it to transmit an unobstructed signal.  Trial Tr. 355:1–17.  The jury could rationally credit that explanation in conjunction with the pattern of other cell-site data that night, notwithstanding Boone's challenge to one data point.

While Bruce posits that Khaled's associates in the drug business robbed him instead, the district court need not "exclude every reasonable hypothesis of innocence" or show that Bruce's position is "wholly inconsistent with every conclusion except that of guilt."  *United States v. Davis*, 8 F.3d 923, 928–29 (2d Cir. 1993) (citation omitted).  Because a rational jury could credit the government's position on the basis of the evidence presented, acquittal as a matter of law is unwarranted.  For the same reason, Boone's suggestion that his presence in Westchester establishes his innocence fails.  In conjunction with the other evidence placing Boone in Astoria when Khaled was seized, around Englewood when Khaled was moved to New Jersey, and in Manhattan when Khaled was released, the jury could reasonably take the government's view.

> **B.      A rational jury could also convict Boone of attempted obstruction of justice.**

A rational jury could conclude beyond a reasonable doubt that Boone attempted to obstruct the federal investigation through his instruction to Charle Sampson during a recorded telephone call.  At the beginning of the call, Sampson complained that her phone was working poorly.  Boone argues that this context suggests that Boone had simply offered her technology advice when he responded that she should delete her iCloud.  But that was not the only statement Boone made: he went on to tell Sampson that someone "said I got your whole iCloud," and that because "they are probably on your shit," Sampson should "delete [he]r whole" account.  GX540-II at 0:12–0:30.  The jury could reasonably construe the explanation as a warning to Sampson that FBI agents had searched his iCloud account and an instruction that she delete her account in order to destroy

18

evidence. That interpretation is bolstered with evidence that before the call, FBI agents told Boone that "they had obtained his iCloud account." Boone Mot. for Acquittal 15. Further, the government provided evidence that Boone had erased portions of his own iCloud account two days after the kidnapping, consistent with his advice to Sampson. Although Boone suggests that he was simply providing Sampson technical support, the Court may not set aside the jury's rational decision to infer otherwise given the surrounding circumstances.

Boone also argues that an instruction to Sampson cannot qualify as an attempt to obstruct justice. The jury could conclude otherwise. A person is guilty of attempt only if he performs a "substantial step" towards committing the object offense. *United States v. Delvecchio*, 816 F.2d 859, 861 (2d Cir. 1987) (citation omitted). This Circuit adopts "the Model [Penal] Code's formulation," which looks to a "range of conduct—not always proximate to the designed criminal end"—but still "strongly corroborative of the firmness of the defendant's criminal intent." *United States v. Farhane*, 634 F.3d 127, 146–47 (2d Cir. 2011) (quoting *United States v. Stallworth*, 543 F.2d 1038, 1040 & n.5 (2d Cir. 1976)). While the substantial step "may be less than the last act necessary before" committing the object offense, "mere preparation" does not suffice. *Ibid.*; *see Delvecchio*, 816 F.2d at 862 (looking to actions designed to result in the commission of the substantive crime). While no "bright line[] rules" separate a defendant's mere preparation from a substantial step, courts look to "the particular facts of each case" and the substance of "the crime being attempted" to determine whether the defendant's actions "manifest[ed a] 'firm disposition' to commit" the charged crime. *Farhane*, 634 F.3d at 147 (citation omitted); *see, e.g.*, *United States v. Desposito*, 704 F.3d 221, 233 (2d Cir. 2013) (sending multiple letters urging friends to tamper with trial evidence qualified as substantial step toward obstruction of justice).

19

A rational jury could determine that Boone took a substantial step toward obstructing the investigation into Khaled's kidnapping by directing Sampson to delete her iCloud. The relationship between the parties provides important context: the jury could infer from the government's evidence that Boone had successfully enlisted Charle Sampson to perform acts in furtherance of his criminal endeavors in the past—for instance, by lending him a phone on the day of the kidnapping, driving Boone to Queens, and permitting Boone to park the red minivan at her mother's home. Given that relationship, a jury could infer that Boone's directing Sampson to delete her iCloud "in the ordinary and likely course of things" would have obstructed the kidnapping investigation. *Delvecchio*, 816 F.2d at 862 (citation omitted); *see, e.g.*, *United States v. Abdallah*, 528 F. App'x 79, 83 (2d Cir. 2013) (holding that request to co-conspirators to make fraudulent securities purchase was substantial step in light of specific instructions given and defendant's prior relationship with co-conspirators).

### C.    A rational jury could convict Valentin of conspiracy to kidnap Khaled.

Valentin's motion for a judgment of acquittal on the conspiracy count is denied. Valentin argues that the cell-site data could not have supported his conviction because it did not reveal any activity by him until 12:21 a.m., when the kidnapping was largely over. He also argues that the cell-site data does not specifically show that he participated in Khaled's seizure. Valentin Mot. for Acquittal 4 (Dkt. #242-1). A reasonable jury could conclude based on the record evidence that Valentin agreed to and helped his conspirators kidnap Khaled.

First, the jury could conclude that Valentin participated in Khaled's initial seizure. iCloud backup data indicated that at 12:21 a.m., Valentin's phone was used to make a Facetime call, then received Boone's phone number from Bruce. GX105-I at 41; Trial Tr. 1152:15–1153:7, 1159:1–1160:20. Valentin's phone was then used to message Boone's phone, "Yo hit me I'm behind." GX106. Minutes later at 12:27 a.m., Valentin's phone connected to a cell site covering the east

20

side of Yorkville, in Manhattan. GX706 at 16. The jury, drawing all reasonable inferences for the government, could conclude that Valentin was in Manhattan and received instructions from Bruce to meet with Boone, who was a few miles north on the Harlem River Drive. The jury could then rationally infer that Valentin participated in the kidnapping from the gray Accord but kept his phone off until 12:21 a.m., when he called Boone and Bruce to coordinate Khaled's release in Manhattan.

Valentin argues that because the cell site covering Yorkville was in Queens, he was more likely outside of Manhattan. Valentin Mot. for Acquittal 4. But Agent Wheeler explained that cell signals carry "further across bodies of water," so Valentin could have connected to the Queens cell site *from* Manhattan. Trial Tr. 333:1–8, 353:24–354:5. The Queens cell site was atop an eight-story-tall building, making it particularly well-positioned to serve cell phones across the East River. *Id.* at 355:1–17. And while Valentin further objects that a bank of cell sites on Roosevelt Island would have connected to his phone had he been in Manhattan at midnight, Wheeler explained that Valentin's projected location in Yorkville curved away from Roosevelt Island, making such a connection less likely. *Id.* at 355:8. The inherent imprecision in deriving a defendant's location from cell-site data does not foreclose the jury's conclusion that Valentin was in Manhattan when he texted Boone about his location. Reinforcing the jury's apparent conclusion about Valentin's participation, iCloud data showed Valentin trying to sell a van days after the kidnapping.

Valentin next contends that because LPRs showed that the Ford Explorer he drove to Linkn Wireless was located around Asbury Park about twenty minutes after Khaled was taken, he was unlikely to have participated in the kidnapping. Valentin Mot. to Acquit 4–5. But the jury heard testimony that the Ford Explorer was registered to another owner and driven by multiple

21

individuals, Trial Tr. 517:1–9, 1537:7–22, so it could infer that Valentin was instead in the red minivan or gray Accord on December 9.

In addition to finding that Valentin participated in the kidnapping itself, the jury could find that Valentin advanced the conspiracy by threatening Khaled via text message on the following Monday. Valentin does not dispute that someone used a burner phone that was bought from the Linkn Wireless store he patronized on December 12 to send threatening messages to Khaled's phone. Instead, he argues that the video does not indicate that *he* purchased or used the burner phone at issue because the security footage ends prematurely. Substantial evidence supports the jury's conclusion otherwise. Dupree testified that she helped Valentin activate a cell phone that day. *Id.* at 596:5–13. The jury also heard Wheeler's opinion that because the burner phone and Valentin's phone contacted cell sites in the same or similar locations at similar times, Valentin likely had both phones on his person. GX706 at 19. Accordingly, the jury could rationally find that Valentin conspired to kidnap Khaled.

Finally, the government's circumstantial evidence of Valentin's coordinated activity with Bruce and Boone is sufficient, *contra* Valentin's argument, for the jury to find an agreement to kidnap Khaled. A conspiracy requires an agreement to further a criminal offense, but the government may prove that agreement through "a tacit understanding [among the defendants] to carry out the prohibited conduct." *Anderson*, 747 F.3d at 61 (quoting *United States v. Nusraty*, 867 F.2d 759, 763 (2d Cir. 1989)). A juror is entitled to infer that an agreement existed from circumstantial evidence, such as a defendant's association with conspirators to further the object offense, presence at "critical stages of the conspiracy," or possession of the conspiracy's instruments. *Ibid.* (quoting *United States v. Aleskerova*, 300 F.3d 286, 293 (2d Cir. 2002)). Here, evidence of the parties' coordinated behavior permitted the jury to infer that Valentin agreed to

22

kidnap Khaled at a December 8 meeting coordinated by Bruce, then participated in the kidnapping over the next five days. *See, e.g.*, *United States v. Krivoi*, 80 F.4th 142, 156 (2d Cir. 2023).

> **D.**     **A rational jury could convict Valentin of transmitting threats with intent to extort.**

A reasonable jury could conclude that Valentin went to Linkn Wireless on December 12 and activated a burner phone, which he used to transmit threats pressuring Khaled to pay a ransom. Valentin's arguments that no jury could conclude that he purchased or used the burner phone fail for the reasons discussed above.

Valentin separately argues that he was in the store for eight minutes, while phone activation typically takes at least ten minutes. *See* Trial Tr. 614:3–4. But a jury crediting Dupree's testimony that she activated Valentin's phone and Wheeler's opinion that the burner phone's location tracked the locations of Valentin's personal phone could rationally conclude that Dupree activated Valentin's phone very quickly, instead of inferring that Dupree and Wheeler were mistaken.

Valentin further argues that the iCloud data extracted from Khaled's phone indicated that the three messages transmitted by the FBI agents were sent around 9:30 a.m. on December 13, not 6:23 p.m. GX162 at 2. As Valentin sees it, this gap in time undercuts the government's theory that he received the FBI's text messages at 6:23 p.m. and called Bruce two minutes later to discuss Khaled's ransom. But the government explained this discrepancy to the jury. Cell records provided from AT&T indicated that the burner phone *received* the messages at 6:23 p.m., indicating that the burner phone was turned off until then. *See* GX705B at 2. The jury could credit this explanation, so a judgment of acquittal is unwarranted.

> **E.**     **A rational jury could convict Bruce of conspiracy to kidnap Khaled.**

Bruce's motion seeking acquittal on the conspiracy count is denied. Bruce argues that the cell-site and call record data cannot support his conspiracy conviction because a defendant's "mere

23

presence at the scene of a criminal act or association with conspirators does not constitute intentional participation" in the conspiracy. *Huezo*, 546 F.3d at 181 (quoting *United States v. Samaria*, 239 F.3d 228, 235 (2d Cir. 2001)).  In Bruce's view, the evidence proves only that he was at home in Astoria during the kidnapping and went to Khan's home after to support him.

Substantial evidence permits the jury to conclude that Bruce's actions went "well beyond mere presence or association." *Ibid.*  Khan testified that when Bruce arrived at his home, he was "on his phone a lot" even though Khan's close friend had just been abducted.  Trial Tr. 641:22– 642:2.  While Bruce explained that he was talking to "[s]ome girl he was supposed to meet," *ibid.*, cell-site data indicated that he was calling the Sampson phone and the Boone phone at that time, GX706 at 14.  The government also pointed out that Khaled overheard his assailants state that there were "too many cops" around his apartment—something they could only have learned from a conspirator in Astoria because the assailants were in New Jersey at the time.  Trial Tr. 95:7–8. Bruce, who was at Khan's home, knew Khan had called the police.  This sequence supports the jury's apparent inference that Bruce participated in the kidnapping conspiracy from Khan's home.

Other cell-site evidence provided further support for the conclusion that Bruce participated in Khaled's kidnapping and orchestrated his release.  Data extracted from Valentin's phone indicated that Bruce sent Valentin the address of Bruce's then-girlfriend's home on December 7. Cell-site data then placed the three defendants' phones near that home the next day.  *Id.* at 1146:9– 1147:3; GX706 at 7.  Cell-site and LPR evidence also showed that four minutes after the red minivan crossed the George Washington Bridge from New York, Bruce's phone connected to a cell site near the bridge's New Jersey approach.  GX706 at 11.  The cell data also indicated that at 12:23 a.m., shortly before Khaled's release, Bruce sent Boone's phone number to Valentin's phone, prompting Valentin to message Boone that he was behind him.  GX105-I at 41; Trial

Tr. 1159:1–16. Finally, Valentin called Bruce's phone at 6:23 p.m. on December 13, two minutes after the burner phone received text messages from the FBI inquiring into Khaled's ransom logistics. GX706 at 19. This pattern of events permitted the jury to conclude that Bruce participated in Khaled's kidnapping and the attempt to obtain a ransom.

It is true, as Bruce points out, that the cell-site evidence identifies "only the tower sector serving the phone," and that the call-record evidence did not disclose the subject of the calls. Bruce Mot. for Acquittal 8, 10–11 (Dkt. #260-1). But the government appropriately used circumstantial evidence to prove its case. Given Khan's testimony, Bruce's presence in New Jersey when the red minivan was there, the timing of Bruce's calls to Boone and Valentin, and his conspirators' knowledge that someone had called the police, the jury could reasonably infer that Bruce participated in Khaled's kidnapping and orchestrated his release. *See, e.g.*, *Krivoi*, 80 F.4th at 156 (using cell-site data to locate defendants during kidnapping conspiracy); *United States v. Tucker*, No. 05-CR-711 (SAS), 2008 WL 3538714, at *3 (S.D.N.Y. Aug. 13, 2008) (finding that call records could inform how defendant communicated with members of narcotics conspiracy).

Supporting the jury's conclusion, the government also presented evidence that Bruce had a motive to kidnap Khaled. Khan testified that Bruce believed Khaled owed him money for selling him faulty dealer plates. Trial Tr. 632:25–633:6, 703:12–16. Bruce also knew that Khan was a wealthy individual who had loaned Bruce tens of thousands of dollars in the past, making Khan a likely candidate to pay a ransom for Khaled. *Id.* at 643:2–6. Consistent with that motive, Khan testified that Bruce urged him to pay the ransom and not "get the police involved." *Id.* at 640:17–18, 695:15–18. Although another individual gave Khan the same advice, the jury could rationally find that Bruce's advice, all things considered, was part of a scheme with Boone and Valentin. Combined with the cell-site data, a rational juror could conclude that Bruce helped transport

25

Khaled to New Jersey, then returned to Khan's home to facilitate a ransom payment. *See, e.g.*, *United States v. Hampton*, 676 F. Supp. 3d 283, 293 (S.D.N.Y. 2023) (finding evidence that defendant's phone connected to cell sites "as his car traveled" to robbery location probative).

## II.    Valentin and Bruce Are Not Entitled to a New Trial

Valentin and Bruce's arguments regarding laptop access do not warrant a new trial. Federal Rule of Criminal Procedure 33 authorizes a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). But this discretion should be exercised only "sparingly" and "in the most extraordinary circumstances." *United States v. Gramins*, 939 F.3d 429, 446 (2d Cir. 2019)) (citation omitted). The "ultimate test is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Walker*, 974 F.3d 193, 208 (2d Cir. 2020) (citation omitted). Valentin and Bruce argue that their inadequate access to discovery laptops deprived them of due process and adequate access to counsel.

These arguments do not warrant a new trial. First, Valentin and Bruce waived or forfeited this challenge by proceeding to trial despite the Court's instruction that their attorneys confer and propose any remedy they sought for the discovery deficiencies they alleged. "When a defendant, after being alerted to a potential basis for mistrial, fails to demand a mistrial until after the jury returns a guilty verdict, his objection is deemed waived" unless the court's decision reflected a plain error. *United States v. Richards*, 48 F. App'x 353, 355 (2d Cir. 2002) (summary order) (finding objection to juror bias waived); *cf. United States v. Wright*, 420 F. App'x 70, 71 (2d Cir. 2011) (summary order) (finding right to be present at conflict-of-interest hearing waived). Here, I heard the parties' accounts regarding discovery, then asked counsel to confer at the first recess and "and let me know if there's something" the Court should do. Trial Tr. 23:16–19. Rather than seek a continuance or additional relief pertaining to discovery, Valentin's and Bruce's counsel proceeded to try the case. Only the day before summations did Bruce (speaking on his own behalf)

26

repeat his laptop-access concerns. And only after the jury issued its verdict did Valentin and Bruce move for a new trial. By choosing to proceed to trial in the hopes of receiving a favorable merits disposition, Bruce and Valentin at best forfeited their challenge to discovery access. *Cf. United States v. Blume*, 967 F.2d 45, 48 (2d Cir. 1992) (finding that courts had "no hesitation in rejecting" juror-bias claims unraised "until after the verdicts were returned" (citation omitted)).

Valentin and Bruce suggest that their lack of laptop access raises a "structural" error that mandates a new trial. *Greer v. United States*, 593 U.S. 503, 513 (2021). That argument is unpersuasive. The Supreme Court has recognized a limited class of cases that taint the entire proceeding and require "automatic reversal." *Ibid.* (citation omitted). This "highly exceptional" set is typically limited to a defendant's "denial of counsel of choice, denial of self-representation, denial of a public trial, and failure to convey to a jury" that guilt must be proven beyond a reasonable doubt. *See ibid.* (citation omitted).

Valentin and Bruce, relying on *McCoy v. Louisiana*, argue that the denial of discovery materials is similarly structural because knowledge of the discovery materials is necessary for them to shape their defenses. 584 U.S. 414 (2018). *McCoy* is inapposite. In *McCoy*, the Supreme Court recognized a defendant's irreducibly personal right to "plead guilty" or "waive the right to a jury trial." *Id.* at 422. But it also noted that a lawyer is best positioned to make tactical decisions, including "what arguments to pursue" and "what evidentiary objections to raise." *Ibid.* (citation omitted). Because "defendants necessarily relinquish some autonomy" over tactical trial decisions by choosing to be represented, *United States v. Rosemond*, 958 F.3d 111, 119–20 (2d Cir. 2020), and because Valentin and Bruce point to no fundamental decision impeded by their attorneys' control over the discovery record, they have not established structural error.

In addition, Valentin and Bruce have not established plain error that could justify granting a new trial notwithstanding forfeiture.  Courts have held that a defendant, supported by adequate counsel with access to discovery, does not suffer a due-process or right-to-counsel violation simply because he could not also personally review each document before trial.  *United States v. Thompson*, No. 10-CR-200 (DBH), 2013 WL 1809659, at *6–7 (D. Me. Apr. 29, 2013), *aff'd*, 851 F.3d 129 (1st Cir. 2017); *United States v. Faulkner*, No. 09-CR-249 (SAF), 2011 WL 3962513, at *4 (N.D. Tex. Sept. 8, 2011).  Indeed, this Circuit has recognized no "authority requiring defense counsel to review with his client all of the discovery materials that counsel acquires."  *United States v. Blanco*, 811 F. App'x 696, 702 (2d Cir. 2020) (summary order).  Given this, Valentin and Bruce have not established plain error in the Court's declining to *sua sponte* delay trial or impose other measures based on their laptop complaints.

Finally, Valentin and Bruce assert that "cumulative deficiencies" in the substance of the jury's verdict, combined with the allegedly inadequate discovery procedures, warrant a new trial. Bruce Mot. to Acquit 18.  There is no "manifest injustice," *Walker*, 974 F.3d at 208, in permitting the jury's verdict to stand, because the verdict was supported by ample evidence and Valentin and Bruce have not identified a plain error in the discovery procedures afforded to them.  Because the Court finds no cumulative deficiency that warrants a new trial, the motions are denied.

SO ORDERED.

 /s/  Rachel Kovner  
RACHEL P. KOVNER  
United States District Judge

Dated: July 20, 2026  
Brooklyn, New York